**FROMBERG, INC., Appellant,**

v.

**Jack W. THORNHILL et al., Appellees.**

**No. 19764.**

United States Court of Appeals
Fifth Circuit.

March 21, 1963.

Peter A. Schley, Joseph H. Schley, Dallas, Tex., for appellant.

Cecil L. Wood, Dallas, Tex., for appellees.

Before HUTCHESON, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This appeal by the Patentee of the Fromberg Patent of 1957 [1] from an adverse judgment of the District Court presents questions of Defendant's liability for inducing others to infringe under 35 U.S.C.A. § 271(b) [2] and also for his own contributory infringement under § 271(c).

■■ For reasons discussed at greater length, the District Court's findings do not really resolve the critical issues. All it found, in effect, was that Defendant did not infringe. While the findings are inadequate, we conclude that they are sufficiently definite to indicate that the Court was apparently laboring under misapprehension as to just what the critical issues were. Consequently, we cannot appraise many of them in the usual terms of the clearly erroneous concept of F.R. Civ.P. 52(b). [3] At the same time it is not

a case for a mere remand under directions to cure a procedural omission by directions to make findings. [4]

This particular procedural twist, the simplicity of this device, the clear-cut nature of the acts under scrutiny and the express acknowledgment that validity is not in question relieve us of an extended discussion of the patent. Perhaps even more fortunate, we need not attempt a paraphrasing of the patentese of the claims. Thermo King Corp. v. White's Trucking Service, Inc., 5 Cir., 1961, 292 F.2d 668, 675.

Fromberg discloses a simple device toward solving another one of the automotive age's problems—the repair of a puncture in the modern tubeless tire. [5] The contribution—although hardly claimed to have been earth-shaking—is principally that the tire can be repaired without demounting the tire thus elimi-

---

1. Patent No. 2,828,791 issued April 1, 1958, filed January 29, 1957.

2. "§ 271. Infringement of patent
   "(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.
   "(b) Whoever actively induces infringement of a patent shall be liable as an infringer.
   "(c) Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.
   "(d) No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his

consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement. July 19, 1952, c. 950, § 1, 66 Stat. 811."

3. In many cases we have pointed out that findings are not insulated by F.R.Civ.P. 52(a) where they are the likely product of erroneous substantive legal standards. See, Camilla Cotton Oil Co. v. Spencer Kellogg & Sons, Inc., 5 Cir., 1958, 257 F. 2d 162; United States v. Williamson, 5 Cir., 1958, 255 F.2d 512; Henderson v. Flemming, 5 Cir., 1960, 283 F.2d 882.

4. Victory Towing Co. v. Bordelon, 5 Cir., 1955, 219 F.2d 540, 1955 A.M.C. 553; Myles v. Quinn Menhaden Fisheries, Inc., 5 Cir., 1962, 302 F.2d 146, 1962 A.M.C. 1626; see also Employers' Liability Assur. Corp. v. Weeden, 5 Cir., 1960, 274 F.2d 809; Founders' Ins. Co. v. Rogers, 9 Cir., 1960, 281 F.2d 332, 1961 A.M.C. 330; Morales v. Bull Steamship Co., 1 Cir., 1960, 279 F.2d 299, 1961 A.M.C. 433.

5. It has had remarkable commercial success:

| Year | Number Sold |
|---|---|
| September 1956 | Sales began |
| 1957 | 1,126,325 |
| 1958 | 2,488,250 |
| 1959 | 4,024,297 |
| 1960 | 5,274,543 |
| 1961 | 4,313,962 |

nating the risk of rim leaks. Recognizing the likelihood that Judges make poor patent draftsmen, we describe it loosely with like simplicity. In effect, the appliance is in two parts. One part is a hollow metal tube a couple of inches in length and, for varying repairs and tires, about one-quarter inch or so in diameter. The second part is a rubber cylindrical plug. This plug is inserted in the hollow tube for its whole length. This rubber insert is held firmly in place through compression. In its manufactured state, it is all in one piece—a solidly filled metal tube. In use it works this way. By a special tool,[6] the assembly is inserted into the hole in the body of the tire. By manipulation of the special tool, the rubber plug insert is pushed out of the metal tube while the tube is being withdrawn from the tire. The result is twofold. First, the hole in the tire is now filled with the rubber plug which, being released from compression of the metal tube, has expanded considerably to afford a seal. Second, the metal tube is now empty. In that condition, it has no further use as a tire repair.

It is at this stage that the Defendant's activities are alleged to (a) induce infringement by others and (b) additionally constitute contributory infringement on his part. The device manufactured and sold by the Defendant is called "Miracle-Plug." [7]

The "Miracle-Plug" is a single piece of compressible rubber. Its main body is a cylinder approximately one-quarter inch in diameter and a couple of inches in length at which place it then tapers down to a one-eighth inch diameter tail about two to three inches in length. It is undisputed that by first inserting the tail into the empty Fromberg metal tube, the Miracle Plug can be forcibly drawn into the tube for its full length. When the surplus body and tail parts protruding beyond the end of the metal tube are cut (by simple pocket knife), the result is a device identical with the original Fromberg appliance.

It is also uncontradicted that Defendant (1) knew of this capability and (2) sold Miracle Plugs with knowledge that at least a substantial number were being used with empty, spent, Fromberg metal tubes.

In a nutshell his justification for this was not a feigned innocence that such uses were actually being made of his Miracle Plug. Rather, it was the bold and candid one that he had a legal right to do this. In the final analysis this came down to the contention that the Miracle Plug was "a staple article or commodity of commerce suitable for substantial noninfringing use," § 271(c).[8]

But as we pointed out earlier, the Court made no finding on this critical issue. As to the claim for contributory infringement, § 271(c), we do not know what the District Judge concluded as to whether Defendant (a) sold Miracle Plugs for the *purpose* of being used in empty Fromberg tubes, (b) knew that this was the purpose for which they would actually (as distinguished from theoretically) be used, or (c) whether such plugs are actually suitable for *substantial* noninfringing use as a staple article.[9] The Judge seemed to look at it as though the Defendant had merely found a cheaper, although perhaps not quite so efficient, way in which to repair a tubeless tire.

It is not for us initially to make these critical decisions. But in detailing the correct legal principles of contributory infringement to be considered

---

6. This is covered under another Fromberg patent not involved in this suit.

7. The record shows that some jobbers or dealers have purchased and used it under their private labels or brands.

8. Tying it all to other recognized uses for a Miracle Plug, this defense encompassed the contention that it was not sold "for use" in a patented machine " * * *

knowing the same to be *especially* made or *especially* adapted for use in an infringement of such patent * * *." § 271(c).

9. As the case is being remanded for reconsideration, we do not by this shorthand summary of the decisive issues in contributory infringement mean to suggest that the issues are necessarily limited to these three.

on remand, we must discuss the facts. At least in one area we indicate rather strong impressions. It is in connection with the latter that we would point out that in the development of the defensive theory, the question of contributory infringement has been so magnified that it has obscured altogether that of inducing infringement by others. As to inducing infringement, § 271(b), we conclude that the Patentee is entitled to a reversal.

■ Evaluation of the evidence as to that phase requires that we consider the conduct—and its legality—on the part of the Defendant's purchasers, the dealers. To be sure, they are not now parties. But their action bears on Defendant's culpability. Moreover, we are freshly reminded that for contributory infringement, there must first be a *direct* infringement. Aro Mfg. Co. v. Convertible Top Replacement Co., 1961, 365 U.S. 336, 341, 81 S.Ct. 599, 5 L.Ed.2d 592.

■ We think that this record shows irresistibly that the dealers are infringing the patent. Infringement arises if one without permission (a) makes, (b) uses, or (c) sells a patented device. 35 U.S.C.A. § 271(a); and § 154. The dealer (tire service station) does that here. No one would question that if a dealer as an incipient Firestone and by his own ingenuity were to fill the empty Fromberg tube with compressible rubber, he is "making" a new appliance. Likewise, he would "use" it were it employed in repairing a tire in his shop. So far as the dealer is concerned, it does not matter what the source of the renewal rubber plug is. When the renewal process is complete, the thing is exactly the same as when sold by Fromberg.[10]

■■ If, as would be the case here, the resulting product, that is the device, is the same as the patented one so that in appearance, form, fact and function, it is identical, it matters not how or in what manner that was brought about. 3 Walker, Patents § 453 (Deller ed. 1937). The person who does that surely infringes, if the term has any meaning at all. But civil culpability need not stop with the dealer who does the final act of making, using or selling. The prohibition of the law, now codified in § 271(b), extends to those who induce that infringement. Of course inducement has connotations of active steps knowingly taken—knowingly at least in the sense of purposeful, intentional, as distinguished from accidental or inadvertent. But with that qualifying approach, the term is as broad as the range of actions by which one in fact causes, or urges, or encourages, or aids another to infringe a patent.[11]

---

10. It was overwhelmingly established by expert testimony and a categorical concession by Defendant that Claims 1 and 2 of Fromberg read precisely on the refilled Fromberg tube. Infringement in fact is flagrant unless the dealer or Defendant had the legal right to refill it.

11. See Walker, Patents (Deller ed. 1962 Suppl.) pp. 1764–1771: "Active inducement, which is considered to be part of the judge-made doctrine of contributory infringement, involves 'the actionable tort of knowingly aiding or abetting another to infringe a patent.' (Note 66 Yale Law Journal 132, 1956) * * * The enactment of Section 271(b), although ambiguous, was supposed to and has been considered to codify prior law. * * * Hence, active inducement or contributory infringement have been generally limited to those situations where the defendant has induced someone else to infringe the plaintiff's patent and when the defend-ant himself has not infringed the patent by making, using, or selling the invention. [Gould-National Batteries v. Sonotone Corp., 130 U.S.P.Q. 26; N.D.Ill. (1961).]"
"The following has been adjudged infringing conduct: licensing others to use infringing machines and processes * * *; fitting machinery for operation at the purchaser's plant; * * * converting machinery or adjusting operating parts * * *; passing on information intending to bring about infringement, (Jones v. Radio Corp. of America, 131 F.Supp. 82); furnishing drawings and granting license (Weyerhauser Timber Co. v. Bostich, D.C., 178 F.Supp. 757, accused machines, Conmar Products Corp. v. Tibony, 63 F.Supp. 372); and granting immunity from suit to an infringer * * *." P. 1764, 1962 Supplement. The cited Jones v. RCA case gives a good

On this phase the Defendant stands condemned by his own admissions and the overwhelming evidence from several witnesses, none of which so far reflects any helpful mitigation. Thus, in selling Miracle Plugs to several dealer-customers, the Defendant personally demonstrated how that Plug could be inserted in an empty Fromberg tube to recreate the original device which he knew to be patented. Without regard, then, to the separate question involved in the § 271 (c) contributory infringement phase whether this was a staple product capable of other uses, the sales pitch for the Miracle Plug was obvious: here is a way to salvage empty Fromberg tubes to enable the dealer to obtain for his stock (and use) a Fromberg device at considerable savings in out-of-pocket cost [12] and the elimination of the economic waste in a useless, spent, tube. This brings it home to Defendant in a spectacular way. From his own motive to profit by sales of Miracle Plugs, he shows his customers how to poach upon another's patent so that the illicit user may likewise profit.

■■ Of course implicit in this discussion—Defendant's culpability based on direct infringement by the dealer—is the assumption that the dealer had no legal right to recreate the Fromberg device. In the light of contemporary developments, that may be a big assumption. What has been tentatively assumed must now be established. This turns on the problem so often epitomized in the verbal symbol "repair or reconstruction."

Where once the ultimate question seems to have been fractured into a series of subsidiary inquiries as to the length of life, cost, etc. of the replaced element of a combination patent in relation to other elements or the completed device as a whole, it has now been reduced to the simpler one: does this really *make* a new device? Aro Mfg. Co. v. Convertible Top Replacement Co., 1961, 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592. Of course it does not take long to recognize that such simplicity is beguiling, and in the process of a judicial determination a number of factors must be considered. Not the least of these will be those in the analogous area of misuse of patents. Akin to these are strong underlying policies against trusts and monopolies. Thus the patent monopoly does not extend to unpatented materials which are used in, or consumed by, the patented machine, process or device. And the effort to achieve that result, or the similar one of limiting the source of an unpatented element in a combination patent, through conditions for the grant of a license constitutes patent misuse.[13]

This makes it essential therefore to examine the Fromberg device to determine its function and purpose. The principal point of this inquiry is whether, when sold by the Patentee, it is reasonably contemplated that the device will be repeatedly used. The patent is for a

---

summary of pre-1952 Code decisions as to acts inducing infringement even without sales.

12. The cost of a Miracle Plug was in the neighborhood of half that of a Fromberg device.

13. See II Walker, Patents, § 405, pp. 1569–1579 (Deller ed. 1937); Walker, Patents (Deller ed. 1962 Supp.), pp. 1569–1579; Carbice Corp. v. American Patents Development Corp., 1931, 283 U.S. 27, 51 S. Ct. 334, 75 L.Ed. 819; International Business Machines Corp. v. United States, 1936, 298 U.S. 131, 56 S.Ct. 701, 80 L. Ed. 1085; Leitch Mfg. Co. v. Barber Co., 1938, 302 U.S. 458, 58 S.Ct. 288, 82 L. Ed. 371; Morton Salt Co. v. G. S. Suppiger Co., 1942, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; B. B. Chemical Co. v. Ellis, 1942, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367; Mercoid Corp. v. Mid-Continent Inv. Co., 1944, 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376; Mercoid Corp. v. Minneapolis-Honeywell Regulator Co., 1944, 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396; International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S. Ct. 12, 92 L.Ed. 20.

Of course § 271 was intended to work some changes in these concepts. See note 18, infra, and Dr. Salsbury's Laboratories v. I. D. Russell Co. Laboratories, 8 Cir., 1954, 212 F.2d 414, 416–417; cf. Stearns v. Tinker & Rasor, 9 Cir., 1957, 252 F.2d 589, 601–602, note 10, p. 602.

tire repair unit. The patent is not for a *means* by which a rubber plug can be inserted efficiently in a tire. If that were so, the patent would essentially cover only the hollow metal tube [14]—an ancient and certainly non-novel thing. Designed, manufactured and sold as a unit, it is likewise used as a unit. Once the rubber plug is extruded into the tire, that part cannot ordinarily be used again. Nor is it expected that the metal tube will be. It has a single-shot function and purpose for a one-time use.

That brings the case precisely within American Cotton Tie Co. v. Simmons, 1882, 106 U.S. 89, 1 S.Ct. 52, 27 L.Ed. 79.[15] There the patent was on metal bands used to bind cotton bales. To open the cotton bale, the metal bands were cut. The Defendant followed the practice of buying the cut bands with buckles as scrap from various compresses. Thereafter the salvage bands were pieced and spliced together by rivets and with the original tie buckles were sold to the trade for their original purpose.

The situation presented was later summarized by the Court: "It is evident that the use of the tie was intended to be as complete a destruction of it as would be the explosion of a patented torpedo. In either case, the repair of the band or the refilling of the shell would be a practical reconstruction of the device." Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co., 1894, 152 U.S. 425, 434, 14 S.Ct. 627, 631, 38 L.Ed. 500. In the tie case itself the Court stated: "What the defendants did in piecing together the pieces of the old band was not a repair of the band or the tie in any proper sense. The band was voluntarily severed by the consumer at the cotton-mill because the tie had performed its function of confining the bale of cotton in its transit from the plantation or the press to the mill. Its capacity for use as a tie was voluntarily destroyed. As it left the bale it could not be used again as a tie. As a tie the defendants reconstructed it, although they used the old buckle without repairing that." 106 U.S. 89, 93–94, 1 S.Ct. 52, 56.

For these reasons we hold that on this record the Defendant was guilty of inducing infringement by others under § 271(b). The judgment is accordingly reversed and rendered as to that with directions to the District Court to grant appropriate relief [16] on remand.

We do not think, however, that at the present time we can as a matter of law reach the same conclusion as to contributory infringement under § 271 (c) insofar as it is based on the sale and distribution of the Miracle Plug. We have held, of course, that where Defendant or his salesmen show a dealer how to recreate a Fromberg device by inserting a Miracle Plug in a spent Fromberg tube, there is direct infringement as an inducer under § 271(b). But a different problem is posed as to routine commercial sales and distributions of Miracle Plugs to dealers or others who might on their own, wholly unaided—that is, "induced" —by Defendant, use them with a Fromberg tube. As to these, the District

---

14. As a practical matter, this would make it merely a replaceable part of the tool for inserting the plug. See note 6, supra.

15. The decision is very much alive as authoritative. It is cited and relied on in the majority, the concurring, and the dissenting opinions in Aro Mfg. Co. v. Convertible Top Replacement Co., 1961, 365 U.S. 336, see at 346, 355, 367, 369, and 373, 81 S.Ct. 599, at 604, 609, 615, 616, and 619, supra. Of course little reliance can be placed on the fact that the metal ties bore the legend "Licensed to use once only."

16. Besides an accounting for damages, 35 U.S.C.A. § 284, this will include injunctive relief, not only as to dealers heretofore identified, but as to all other dealers or users. The prohibition will include any and all written or oral information, promotional or sales literature, advertising material, or the like, supplied by defendant or his agents showing how empty used Fromberg metal tubes may be refilled. The parties, subject to the trial Court's discretionary control, are to be free to offer additional evidence bearing upon the nature and kind of injunctive relief needed or desirable.

Court has not, either expressly or impliedly, made the requisite fact finding, and the case must be remanded for this purpose.[17]

Two fact issues are of critical importance. The first is whether the Defendant sold the Miracle Plugs with the purpose and intention that they be used as refills for used Fromberg metal tubes. The second is whether the Miracle Plugs are, in the words of § 271(c), see note 2, supra, " * * * not a staple article or commodity of commerce suitable for substantial noninfringing use * *." [18] See 3 Walker, Patents §§ 507, 508, pp. 1764–71 (Deller ed. 1937), and pp. 1764–71, 1962 Supp.

Without prejudging the matter or foreclosing the fact findings of the District Court on remand, we think it appropriate to comment on strong impressions thus far felt. In this way the trial Judge can see what we think are the critical points. As to Defendant's conduct, we think that so far the evidence quite plainly reveals that Defendant has manufactured and sold Miracle Plugs with the principal expectation that they would be used in Fromberg tubes. As a witness, he never really denied this. Rather, his position— asserted with candor by his counsel—is that he was legally entitled to do this since the plugs had a substantial noninfringing use. Certainly Defendant was aware of sales promotional work of him-

self and his salesmen and the substantial use of Miracle Plugs in Fromberg tubes by his dealer-customers. And whatever utility they had for noninfringing use, which we shall next discuss, it is plain from a factual standpoint that this was a limited use of little practical consequence in contrast to the number employed in recreating Fromberg devices. Moreover, the record shows that the rubber composition of this Miracle Plug, its general conformation and size, was worked out by Defendant in conjunction with a commercial rubber manufacturing concern, and that in its development frequent tests and experiments were made in conjunction with the Fromberg tubes and devices.[19]

As contributory infringement " * * * is intentional aid or cooperation in transactions, which collectively constitute complete infringement * * *," 3 Walker, Patents § 507, p. 1764 (Deller ed. 1937), the intent and purpose of the Defendant is of critical importance. The quality of Defendant's acts in terms of purposeful intention might be highly relevant in determining the application of § 271(c). See note 18, supra. It might be pertinent in determining whether under pre-existing case law or the amended statute, there could be liability for contributory, infringement even though the Miracle Plug was suitable for noninfringing use.[20] In view

17. Without requiring the reappearance of the witnesses, the determination may be made on the present record as supplemented by the respective parties under appropriate procedure prescribed in its considered discretion by the District Court.

18. Except to acknowledge that § 271 was a congressional disapproval and legislative modification of the court-fashioned Mercoid principles (see note 13, supra), we need not here explore the reach or purpose of such change. The various opinions of the respective Justices in Aro Mfg. Co. v. Convertible Top Replacement Co., 1961, 365 U.S. 336, 81 S.Ct. 599 (see note 15, supra) reflect varying views. See Federico, Commentary on the New Patent Act, 35 U.S.C.A. preceding § 1, at p. 51 et seq. However, on remand the District Court may well find it es-

sential to evaluate the 1952 amendment in terms of the full facts developed and determined.

19. Another factor bearing on this and the second question is the dealer's cost of the Miracle Plug in relation to other plugs to be used with a tire repair needle and not a Fromberg tool; they·are substantially less than a Fromberg unit, but about three times as expensive as an ordinary needle plug.

20. The presence or absence of the element of substantial noninfringing use is significant principally in determining whether there is an *intention* to infringe. The absence of a substantial noninfringing use, of course, warrants the inference of an intention to infringe. Southern States Equip. Corp. v. USCO Power Equip. Corp., 5 Cir., 1953, 209 F.2d 111.

of this, it is all the more important that the trial Court categorically resolve the second issue concerning substantial noninfringing suitability of Miracle Plugs.

The record so far would certainly reflect that a Miracle Plug may physically be used with a needle insert. Again, we have the initial impression that this was all an afterthought since several witnesses acknowledged that they had never known of it until this capability was demonstrated during some pretrial depositions. It seems also equally plain that in consideration of their cost (see note 19, supra), and their general conformation in contrast to traditional needle-type plugs, the sale of Miracle Plugs for such use would have been slight indeed.

Taking the statute on its own terms, it is apparent that a mere theoretical capability would hardly suffice. The statute speaks in triple terms of (1) "a staple article," (2) "or commodity of commerce" which is (3) "suitable for substantial noninfringing use." If and when it is determined that it was De-

fendant's intention to sell the Miracle Plug as "a component of a patented * * combination * * *" for "use in practicing a patented process," he would have to show that suitability for such noninfringing use was actual and substantial.

One further comment is in order. While the prior Hawkinson patent [21] might possibly bear on this second issue, it can afford no defense as such to a claim of infringement. Assuming that it reads on the Miracle Plug, it affords no license to practice the subsequent Fromberg patent even though Fromberg is assumed to be a mere improvement over Hawkinson. Ackermans v. General Motors Corp., 4 Cir.1953, 202 F.2d 642.

The case is therefore reversed, rendered and remanded to effectuate full relief under § 271(b) and reversed and remanded for further proceedings not inconsistent with this opinion as to contributory infringement under § 271(c).

Reversed, rendered and remanded in part. Reversed and remanded in part.

As to situations in which *intention* is clearly established by other evidence, there is some indication that suitability for noninfringing use is no defense. See, 3 Walker, Patents § 507 (Deller ed. 1937), "In Westinghouse Electric & Mfg. Co. v. Precise Mfg. Corp., 11 F.2d 209, the Circuit Court of Appeals of the Second Circuit held that the sale of a device capable of an infringing use with intent that it shall be so used is an infringement of a patent, even though it is capable of of a non-infringing use, and even though there may be a form of instructions that it shall be used in a non-infringing way." p. 1765. "But where the machine or other property thus furnished, is useful for some other purpose than to be a part of a patent combination, or to make a patented article, or to be operated upon by a patented machine, or to be used in performing a patented process, and where he who furnishes the property, does not intend or know, when furnishing the same, that it is to be thus used, he incurs no liability to an action for infringement." p. 1767. "In the absence of specific

proof of knowledge or intent, the fact that the property furnished could be used with an article or machine which in itself could not be an infringement, and that there are many such articles or machines in use is sufficient to absolve one who supplies such property from the charge of infringement." p. 1768. In Charles H. Lilly Co. v. I. F. Laucks, Inc., 9 Cir., 1933, 68 F.2d 175, 185, cert. denied 293 U.S. 573, 55 S.Ct. 84, 79 L.Ed. 671, the Ninth Circuit emphasized the language from Leeds & Catlin Co. v. Victor Talking Machine Co., 2 Cir., 1907, 154 F. 58, 60, 23 L.R.A.,N.S., 1027 (affirmed 213 U.S. 325, 29 S.Ct. 503, 53 L. Ed. 816): "* * * the doctrine of contributory infringement has never been applied to a case where the thing contributed is one of general use, or suitable to a variety of other uses, especially where there is no definite purpose that the thing sold should be employed with others to infringe a patent right."

21. No. 2,612,930, October 7, 1952, licensed to Defendant on the eve of the trial below.