OAK INDUSTRIES, INC. and
International Telemeter
Corp., Plaintiffs,

v.

ZENITH ELECTRONICS
CORP., Defendant.

No. 84 C 3045.

United States District Court,
N.D. Illinois, E.D.

Sept. 20, 1988.

James G. Hunter, Jr., David A. York, David S. Foster, Latham & Watkins, Chicago, Ill., for Oak Industries.

Richard C. Yarmuth, Kathleen L. Albrecht, Culp, Dwyer, Guterson & Grader, Seattle, Wash., for Intern. Telemeter Corp.

Michael Barclay, Stuart Lubitz, Spensley Horn Jubas & Lubitz, Los Angeles, Cal., John F. Flannery, Robert K. Schumacher, Fitch, Even, Tabin & Flannery, Chicago Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiffs bring this infringement action on a patent that teaches a method for eliminating a particular type of interference ("direct pickup interference") used in the cable television industry. U.S. Patent No. 3,333,198 ("the Mandell patent") was granted to plaintiffs' predecessors in interest on July 25, 1967, and it expired in 1984. Prior to the expiration date defendant Zenith sold cable television converters that allegedly practiced the method disclosed in the Mandell patent. While plaintiffs concede that Zenith did not actually use the method and therefore cannot be held liable for direct infringement, they assert liability for active inducement and contributory infringement. 35 U.S.C. §§ 271(b) and (c). Zenith moves for summary judgment on the grounds that it did not actively encourage others to infringe the asserted patent and that the products it sold had "substantial noninfringing use," negating liability for contributory infringement. On a cross-motion for partial summary judgment plaintiffs ask for a judgment of infringement with respect to the sale of certain Zenith converters (the SC–100 and ST–3000 line) and for an order specifying that no substantial con-

troversy exists with respect to inducement on the remaining Zenith converters (the Z–TACs). We·deny both motions.

## BACKGROUND

A community antenna television (or CATV) system receives broadcast television signals at a central antenna and retransmits them from a principal location (the "head-end") over coaxial cables to subscribers. This litigation focuses on a method used in CATV systems to eliminate direct pickup interference. This interference occurs when cable operators retransmit channel signals at the same frequencies that those channels are broadcast over the air from VHF broadcast stations. Although the cables are hooked up directly to the subscribers' television sets, sets may themselves act as antennas, and where the broadcast signal is strong (generally within the station's "grade A contour") they pick up the channel signals directly from broadcast stations. Since there is a fraction of a second delay between the broadcast signal and the cable signal, and the television set's circuitry processes both signals, the cable subscriber's screen displays the interference as a "ghost" image.

This type of interference does not occur in all locations. Where the subscriber's television set is too far away from the broadcasting station, where there is no local VHF broadcast station or where a physical barrier such as a building or a terrain feature obstructs and thereby reduces the strength of the broadcast signal, the television set does not pick up the direct signal. Further, direct pickup interference affects only VHF channels—those between 1 and 12—and not UHF channels that are not sent over the cable at their original frequency. While the interference problem is thus limited, plaintiffs offer contested testimony which would show that by the mid–1960s direct pickup interference was recognized as a pervasive and serious problem for the cable television industry, "limiting the growth of CATV systems in urban areas" (Pls. stmt. material facts ¶ 11).[1]

1. Zenith offers a report by its expert which states that the experience of many cable opera-

The Mandell patent—initially offered as an apparatus patent but rejected as such—singularly claimed the following method for eliminating direct pickup interference:

In a community antenna television system of the type wherein television programs are distributed to subscriber television receivers over a coaxial cable, the method of enabling a subscriber television receiver to receive over said coaxial cable a program using the same television channel as is used by a local transmitter, without interference by said local transmitter, said method comprising tuning said television receiver to a channel not used by said local transmitter, converting television signals received over said coaxial cable having its frequency of a locally transmitted television channel to signals having an intermediate frequency, converting said signals having an intermediate frequence to signals having the frequency to which said television receiver is tuned, preventing radiation from said local transmitter from interfering with said signals received over said coaxial cable, said signals having an intermediate frequency and with said signals having the frequency to which said television receiver is tuned, and applying said signals having the frequency to which said television receiver is tuned to said television receiver.

(Zenith stmt. material facts ¶ 3.) In other words, the Mandell patent taught a method of eliminating direct pickup interference by converting the cable signals in a shielded box to a vacant frequency, one that is not used by a local transmitter, *i.e.*, in Chicago, channels 3 or 4, and tuning the television to that channel. Since there would be no local transmission at the vacant frequency, there would be no interference.

Plaintiffs offer evidence showing that alternative attempts to eliminate direct pickup interference prior to the invention of the Mandell methods were imperfect. First, cable system operators could have simply omitted the transmission of the local station, but then cable subscribers would have been deprived of the advantages of CATV systems, such as the elimination of "multipath" echos caused by the broadcast of channels in urban areas where the signals bounce off nearby structures.[2] Second, while some subscriber television sets could have been modified so that they would not have picked up local stations, others could not have been, and the industry was wary of becoming responsible for the subscribers' sets themselves.[3] Third, increasing the cable signal by amplifiers might have overpowered the ghost produced by the interference,[4] but this technique, plaintiffs contend, was thought to have been prohibitively expensive. A final alternative to the Mandell patent was the conversion of local channels at the head-end to vacant frequencies—"head-end channel shifting"—prior to reception in the subscriber's home. Zenith states that roughly ten per cent of the users of its products employed head-end shifting during the relevant time period. Under this method all local channels were converted to different vacant channels where there was no local interference—2 became 3, 5 became 6, 7 became 8, and so on.

Zenith began selling products for the cable industry in 1979, providing cable operators with head-end equipment and convert-

---

tors shows direct pickup interference to be a "small problem, but it can continue to recur throughout the system and in those cases where it does exist, it can be annoying" (O.D.Page decl. exh. 2). The report also states that this problem is easily corrected by "good engineering practice" and particularly emphasizes the use of "head-end channel shifting."

**2.** Plaintiffs offer further obstacles associated with leaving locally broadcasted channels off the CATV system, such as an earlier Federal Communication Commission "must carry" regulation, and the problem of disconnecting the

cable from the television set whenever the subscriber desires to watch a local channel.

**3.** Parties agree that "cable ready" television sets shield against direct pickup interference, but it appears that these recently manufactured television sets were not in significant use during the relevant time period.

**4.** Plaintiffs' expert would testify that in order to eliminate direct pickup interference with this method the cable signal must overpower the broadcast signal by a factor of one hundred (Brownstein dep. p. 88).

ers for operators to rent to subscribers (Foust decl. ¶¶ 5–11). In 1979 Zenith became aware of the Mandell patent and inquired of plaintiffs concerning possible licensing, but it did not seek authorization to sell the products. Before the expiration of the Mandell patent, Zenith sold 2,116,954 units of its Z–TAC products and 12,613 units of the SC–100 and SC–3000 converter lines (supp. Barclay decl. ¶ 6). Zenith contends that it sold these products directly to cable operators and did not have extensive contact with the subscribers themselves. Zenith further asserts that because it did not deal directly with subscribers "it also [did not] know whether those [converters were] installed in locations where direct pick-up interference exist[ed]" (Foust Declaration ¶ 23). Plaintiffs' expert would testify, however, that approximately 80 to 90 per cent of Zenith's converters were used by subscribers within the grade A contour, where the broadcast signal is strong and there is a threat of direct pickup interference (Stern dep. p. 271).

While the method of the Mandell patent may have been novel in the 1960s, when it was first introduced, almost all converters in the cable industry during the relevant time period assumed the existence of the method. Technological developments in the industry, however, have provided the converter box with additional functions distinct from eliminating direct pickup interference. For example, the Zenith Z–TAC, the primary accused device of this litigation, expands the number of channels a subscriber can receive and unscrambles protected signals used by the industry for special programming.[5] The devices also provided cable operators with "addressability"—the ability to operate and respond to individual subscriber homes. Plaintiffs allege, with support, that while the Zenith Z–TAC combined these functions into one converter and therefore performed functions outside the subject matter of the Mandell patent, it also converted signals to vacant frequencies in order to eliminate direct pickup interference. Plaintiffs argue that users of these products directly infringed upon the patent rights and that Zenith, by furnishing these direct infringers with the products used to infringe, is liable for active inducement and contributory infringement.

## DISCUSSION

Plaintiffs contend that Zenith actively induced infringement by its sale of its Z–TAC, SC–100 and SC–3000 converters, thereby becoming liable for actively inducing infringement pursuant to 35 U.S.C. § 271(b); and that it is, alternatively, liable as a contributory infringer pursuant to 35 U.S.C. § 271(c) because its converters practiced the patented process, were knowingly made for that purpose, and were not staple articles of commerce suitable for substantial noninfringing use. Zenith apparently disputes the validity of the patent, although it concedes validity for the purposes of its motion. It also contends that its Z–TAC converters do not directly infringe the method patent even when used by a subscriber to eliminate interference, but it assumes infringement for the purposes of its motion. It concedes that its SC–100 and SC–3000 converters are capable of direct infringement if the patent is valid. That concession is the basis for plaintiffs' cross-motion for partial summary judgment. For the purposes of these motions, therefore, the issues with respect to the various converters are the same and they are common to the cross-motions. For convenience, we deal first with Zenith's motion.

In opposing Zenith's motion for summary judgment we read all the evidence in the record, and reasonable inferences to be drawn from it, in the light most favorable to the plaintiffs. Plaintiffs, however, must offer sufficient evidence to establish that they can carry their burden of proving infringement and genuinely dispute a material issue raised by Zenith's defense. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). As a

---

**5.** Devices which provided channel expansion or unscrambling were in use prior to the Mandell patent.

basis for its motion, Zenith contends that its products were staple articles capable of substantial noninfringing use and it was those uses which it promoted.

■ A holder of patent rights over a process or method, who does not or cannot obtain a patent over the device itself, often must rely upon a concept of indirect infringement to protect the patent monopoly. That concept "exists to protect patent rights from subversion by those who, without directly infringing the patent themselves, engage in acts designed to facilitate infringement by others. This protection is of particular importance in situations ... where enforcement against direct infringers would be difficult, and where the technicalities of patent law make it relatively easy to profit from another's invention without risking a charge of direct infringement." *Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176, 188, 100 S.Ct. 2601, 2609, 65 L.Ed.2d 696 (1980).[6] Without the concept of indirect infringement there would be little incentive for inventors to conceive new methods for uses of unpatentable devices. *See* Comment, *Patent Law—Contributory Infringement of a Process Patent*, 26 N.Y.L.Sch.L.Rev. 1108, 1119–20 (1981). That concept is often referred to as contributory infringement. "Contributory infringement of a process patent by the sale of apparatus is established where one offers for sale a device which may be and ordinarily is used, and is sold with the intention of being used in accordance with the patented process." 6 Lipscomb's Walker on Patents § 22:7 (3d ed. 1987). *See Zemel Bros., Inc. v. Dewey Electronics Corp.*, 218 U.S.P.Q. 722 (N.D. N.Y.1982); *Dennison Manufacturing Co. v. Ben Clements and Sons, Inc.*, 467 F.Supp. 391, 428, 203 U.S.P.Q. 895, 925 (S.D.N.Y.1979).

The patent statute imposes liability for indirect infringement both for active inducement of infringement and contributory infringement. While it may often be convenient to refer to contributory infringement to encompass both, particularly since conduct which runs afoul of one generally also runs afoul of the other, they are distinct concepts.

Under 35 U.S.C. § 271(b)

[w]hoever actively induces infringement of a patent shall be liable as an infringer.

Under 35 U.S.C. § 271(c)

[w]hoever sells a ... material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

*Inducement*

Under § 271(b) "[w]hoever actively induces infringement of a patent shall be liable as an infringer." This provision states a theory for aiding and abetting an infringer. See S.Rep. No. 1979, 82d Cong., 2d Sess., reprinted in 1952 U.S.Code Cong. & Admin.News 2394, 2421. Zenith seeks summary judgment on this issue, arguing that plaintiffs have offered no evidence that would show that Zenith actively encouraged cable users to infringe the method of the Mandell patent. It cites us to cases where courts have refused to find inducement by the sale of products with substantial noninfringing use, without finding active steps of encouragement.

■ Although a seller of a device that is capable of substantial noninfringing use will not be liable for contributory infringement, liability may still be established under § 271(b) if, in addition to the sale of that product, active steps are taken to encourage direct infringement. *See* Rich, *Infringement under Section 271 of the Patent Act of 1952*, 21 Geo.Wash.L.Rev. 521, 539 (1953). However, the mere sale, without more, of a device capable of such nonin-

---

**6.** Although the parties in *Dawson Chemical* admitted that their actions constituted contributory infringement, and the Court's chief focus was therefore on the scope of the doctrine of patent misuse, the Court nonetheless extensively discussed the law of contributory infringement under § 271(c).

fringing use will not establish liability for inducement. *See id.*, at 542 (discussing legislative history; P.J. Frederico, *Commentary on the New Patent Act 53 (1952)* ("clearly something more than mere knowledge of an intended infringing use would have to be shown to make out a case of active inducement under paragraph (b)"). Courts have held that inducement requires

"active steps knowingly taken—knowingly at least in the sense of purposeful, intentional, as distinguished from accidental and inadvertent." [*Fromberg, Inc. v. Thornhill*, 315 F.2d 407 (5th Cir. 1963) *supra.*] Expressed differently, to sustain a claim of inducement, the plaintiff must establish that the defendant purposefully caused, urged or encouraged another individual to infringe plaintiff's patent with knowledge of the likely infringing result.

*Goodwall Construction Co. v. Beers Construction Co.*, 216 U.S.P.Q. 1006, 1009 (N.D.Ga.1981) (citations omitted). *See also EWP Corp. v. Reliance Universal, Inc.*, 221 U.S.P.Q. 542, 554 (S.D. Ohio (1983) [available on WESTLAW, 1983 WL 2197] (§ 271(b) requires "first, some purposeful action in furtherance of an actual infringement by another, and second, knowledge of the likely infringing result"), *rev'd on grounds of obviousness*, 755 F.2d 898 (Fed. Cir.1985). In *Plastering Development Center v. Perma Glas–Mesh Corp.*, 371 F.Supp. 939 (N.D.Oh.1973), holders of rights to a method patent brought action against sellers of a product that admittedly had substantial noninfringing uses. The court there analyzed various price lists for the product which plaintiffs contended constituted inducement to infringe, and concluded that the evidence did not establish inducement.

[I]n order to hold defendants liable for inducement to infringe said [method] patent, plaintiffs have the burden of showing ... that the defendant has encouraged others through its literature, to take each and every step of the method.

*Id.* at 950. *See also Universal City Studios, Inc. v. Sony Corp. of America*, 480 F.Supp. 429, 460 (C.D.Calif.1979) (suggesting that plaintiffs must show causal relationship between alleged inducing activity and direct infringement), *aff'd*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984).

It may be that a seller of a product that infringes by its apparent and expected use may not need to actively encourage in order to be liable for aiding and abetting the infringer. In *Dennison Manufacturing, supra*, the court stated that defendants had instructed customers and the distributors to make connections "in precisely the manner set forth in the method claims." 467 F.Supp. at 428, 203 U.S.P.Q. at 925.

Thus, defendant sells a product that is obviously designed to function and be used in a specific manner, knows that it is so designed and intends it to be used in an infringing manner, and demonstrates that use to its distributors, presumably so that they may, in turn, do the same for their customers in promoting the sale of the product. The fact that defendant does not actually instruct the ultimate users of the product in its use does not prevent our finding active inducement or infringement, *since the intended manner or use of the product is readily apparent.*

*Id.* (emphasis added).

Plaintiffs maintain that specific instructions to cable subscribers about the method of the Mandell patent were unnecessary since converters were made to infringe and the use of them in that manner is readily apparent. Cable subscribers need not have modified the Zenith converters, nor actually have constructed the apparatus that performed the patented method. All that was necessary for infringement was for cable subscribers to turn the converters on and adjust the signal output to channel 3 or 4. Indeed, Zenith did instruct cable subscribers on this adjustment. *See* Zenith Attachment E: "Turn TV on—Be sure TV is on and turned to the proper output channel for your cable system (Channel 2, 3 or 4)". As exemplified by the district court in *EWP Corp. v. Reliance Universal, Inc., supra*, the sale of the product itself may in some instances be sufficient under § 271(b). Zenith argues that they never advised cable users or operators about the problems of direct pickup interference, but

plaintiffs submit evidence indicating that this interference was such a well-known phenomenon in the industry that specific reference to the purpose for using a vacant channel was implicit and unnecessary.

It is, perhaps, an unwarranted extension of § 271(b) to use it as a basis for ascribing liability in the absence of active solicitation. The same conduct—sale of material or apparatus which can only be used in an infringement—is contributory infringement under § 271(c). The supplier of a staple will be liable for active inducement if it tells its purchaser, "Here is how we can help you infringe." It is liable if it sells a compound containing the staple when that compound can only be used effectively to practice a patented method, and it so intends, and § 271(c) so provides. The supplier is not liable if it merely makes that staple available, even though it knows that some purchasers will use it to infringe, and § 271(c) makes that distinction. In the absence of active solicitation, then, we cannot know if the sale amounts to active inducement (if the concept plays any role here at all) without knowing precisely what is being sold and what alternate uses it may have. In this case the concept of active inducement merges with the issues implicit in § 271(c), for we must decide whether, if at all, the Z–TAK is a staple article of commerce. We turn then to § 271(c).

*Contributory Infringement*

■ Section 271(c) liability requires a showing that the device sold was used in practicing a patent process and that the seller knew it was especially made for that purpose and not a staple article suitable for a substantial noninfringing use. Zenith, for the purposes of its motion, does not contest that it knew that the Z–TAK could be used to practice the Mandell patent. Its motion focuses on the conjunctive of § 271(c), which states that in order for there to be liability for contributory infringement the product sold must have been made for the infringing use and is unsuitable for substantial noninfringing use. This provision, according to one view, codified a traditional patent requirement which recognized that sellers of products

capable of noninfringing use may lack the intention necessary for a finding of infringement. "The presence or absence of the element of substantial noninfringing use is significant principally in determining whether there is an *intention* to infringe. The absence of a substantial noninfringing use, of course, warrants the inference of an intention to infringe." *Fromberg, Inc. v. Thornhill*, 315 F.2d 407, 414 n. 20 (5th Cir.1963) (emphasis in original) (citations omitted).

Zenith claims that its products performed other functions, such as channel expansion and unscrambling of coded progress, and are therefore capable of substantial noninfringing use. This argument is legally flawed.

Defendant begins with a disability. These alternative functions were submitted as evidence by Zenith in an earlier motion for summary judgment in the Central District of California. This case was originally consolidated there by a November 1986 order of the Judicial Panel on Multi–District Litigation. In February 1986 Judge Rafeedie denied Zenith's motion (pls. exh. A). Plaintiffs argue that this earlier disposition renders Zenith's motion before this court a violation of the law of the case. We disagree. This earlier decision denying summary judgment was not a review by an appellate court and Zenith now submits factual issues not then before the district court. We therefore do not consider this renewed motion for summary judgment a procedural error. We do, however, visit the issue cautiously. As we shall see, moreover, we do find Judge Rafeedie's rationale persuasive on the issues and correct as a matter of law.

It is hornbook law that distinctions in the particular apparatus used are irrelevant for determining whether a device is capable of infringing a method patent. *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482 (Fed.Cir.1984); *International Glass Co. v. United States*, 408 F.2d 395, 400, 187 Ct.Cl. 376 (1969). This rule parallels the patent axiom that mere additions and improvements upon a patented device do not avoid infringement. *See Datascope Corp. v.*

*SMEC, Inc.*, 776 F.2d 320, 326 (Fed.Cir. 1985) (" 'an embellishment' made possible by technological advances may not permit an accused device to escape 'the web of infringement' "); *Amstar Corp., supra,* (collecting cases). *See also* 6 Lipscomb's Walker on Patents §§ 2:29–22–30 (3d ed. 1987). From these rules it is clear that the addition of channel-expanding and unscrambling functions to the accused devices would not preclude a finding of direct infringement by users of Zenith's converters. The question remains, however, whether the addition of these functions qualified the products so that they were capable of substantial noninfringing use, thereby averting Zenith's liability for contributory infringement. We believe that it has not been conclusively demonstrated that they did not, and that contributory infringement can possibly be established.

Section 271(c) covers a lot of ground, and the cases which interpret it are relatively few in number. One is left with the conclusion that the fact variations which may invoke § 271(c) are infinite and that standards derived from a specific fact situation are necessarily suspect in other circumstances. We must, ultimately, apply statutory language to a specific fact situation in light of the congressional purpose. And that purpose can perhaps be no better defined than according the patent owner a reasonable area of protection, and according others a reasonable latitude in pursuing the fruits of technological change.

Let us go back to what is, or at least appears to be, undisputed. Suppression of VHF broadcast interference is not always necessary. For many, if not most CATV subscribers, however, it is necessary, and they would not accept a converter that did not provide that function. Accordingly, cable networks would not offer converters without that facility and manufacturers, such as defendant, could not market a device that did not include a suppression feature. An unscrambling function may be an essential, and indeed the only essential function in some areas. A channel expansion feature may be an essential function in many areas and the only essential function in some. A VHF interference suppression function may not be needed in some areas or in some specific locations. Other functions may be desirable or essential in some circumstances. There are other ways to eliminate VHF interference. Even in an interference area, a viewer watching a UHF cable channel does not use the Mandell patented method. The Zenith Z–TAC combines a number of functions, one of which (for the purposes of this motion) is the suppression of VHF interference in a manner infringing the Mandell patent method. Can that mean that the seller of the Z–TAC contributorily infringes? We believe that the answer is that it possibly can.

Let us go back to what we know from the cases, which on occasion require us to interpolate from concepts of patent misuse or copyright. A herbicide seller contributorily infringes if the only use of the material is in a patented method. *Dawson Chemical, supra.* If the manufacturer added a fertilizer as an additional ingredient, could he escape liability for the reason that the fertilizer was a staple? We think not. Perhaps the fertilizer might be helpful in growing some crop where the herbicide is an incidental waste, but the possibility, or even the likelihood, that someone may use it in a noninfringing manner does not protect the manufacturer.

■ Additional functions in a device that practices a patented method does not diminish direct infringement and, therefore, the fact that the device sold has other functions which are performed simultaneously with the patented method does not otherwise substantiate a noninfringing use for the purposes of § 271(c). This rule flows directly from the logic of the patent laws. To hold to the contrary would allow sellers of products that are clearly intended to infringe a patented method to avert liability simply by adding functions to that device. Therefore, we do not think it enough that Zenith may have combined in the same package several devices: one to suppress VHF interference, one to unscramble signals, and one to expand channels.

That does not mean that a supplier of a staple is liable for contributory infringement even if he knows its intended use. A supplier of potassium nitrate need not be concerned about his purchasers' anticipated combination, *see Hodosh v. Block Drug Co.*, 833 F.2d 1575, 4 U.S.P.Q.2d 1935 (Fed. Cir.1987), but he needs to be concerned if what he is supplying is a recipe or combination useful only for practicing a method that directly infringes a patent. If *Oxy Metal Industries Corp. v. Quin–Tec, Inc.*, 216 U.S.P.Q. 318 (E.D.Mich.1982), is to the contrary, this court disagrees with that conclusion.

█ That does not, however, lead to the conclusion that the seller of a device which, to perform one function, necessarily but incidentally is capable of performing an unrelated infringing function, is a contributory infringer. *Sony Corp. v. Universal City Studios*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984), suggests that if the device has an unrelated use beyond the scope of patent protection (time-shifting), an inevitable possible use which directly infringes does not cause the seller of the device to contributorily infringe. Perhaps the result there would have been different if reasonably uncomplicated technology permitted a Betamax to differentiate between temporary recovery for time-shifting and permanent preservation of copyrighted material. The present record does not conclusively establish whether the Zenith Z-TAC is in effect a combination of separable functions in a single package, one of which leads to infringement, or a device designed for other purposes which, because of the limits of technology, necessarily and incidentally permits the practice of the patented method if those other purposes are to be accomplished. Can a simple change in design leave, for example, the channel-expansion function intact, while eliminating the capacity to eliminate VHF broadcast interference? We do not know.

Zenith claims that when its products were used in areas where there was no threat of this interference, such as in areas outside a local transmitter's "grade A contour" or where cable operators employed head-end channel shifting, there was no direct infringement and therefore the converters were capable of substantial noninfringing use. Zenith contends that in roughly ten per cent of its sales the products were used in areas where direct pick-up interference did not pose a problem.

In order to establish contributory infringement plaintiffs must show direct infringement by cable users. *See Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961). We believe, however, that the contention relates to damages. If the device is a package of separable functions, one of which often infringes, Zenith is liable only to the extent of that use. If it is a different animal, then there may be no contributory infringement, even though a user may often directly infringe. The extent to which geographical and operational factors preclude direct infringement does not necessarily avoid Zenith's liability, although it may be relevant in determining damages owed to plaintiffs. The parties have addressed neither the tentative legal views here expressed nor the factual implications of those views, and we therefore leave both to another day.

Defendant's motion for summary judgment is denied. And because we leave that for another day, the plaintiffs' motion for partial summary judgment respecting the SC–400 and SC–3000 converters is likewise denied. Finally, we recognize that Zenith has asked for certification to permit an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Because we have, in effect, invited a further discussion of both legal and factual issues, that motion is also denied.