(Slip Opinion)	OCTOBER TERM, 2004	1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## METRO-GOLDWYN-MAYER STUDIOS INC. ET AL. *v.* GROKSTER, LTD., ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 04–480.  Argued March 29, 2005—Decided June 27, 2005

Respondent companies distribute free software that allows computer users to share electronic files through peer-to-peer networks, so called because the computers communicate directly with each other, not through central servers.  Although such networks can be used to share any type of digital file, recipients of respondents' software have mostly used them to share copyrighted music and video files without authorization.  Seeking damages and an injunction, a group of movie studios and other copyright holders (hereinafter MGM) sued respondents for their users' copyright infringements, alleging that respondents knowingly and intentionally distributed their software to enable users to infringe copyrighted works in violation of the Copyright Act.

Discovery revealed that billions of files are shared across peer-to-peer networks each month.  Respondents are aware that users employ their software primarily to download copyrighted files, although the decentralized networks do not reveal which files are copied, and when.  Respondents have sometimes learned about the infringement directly when users have e-mailed questions regarding copyrighted works, and respondents have replied with guidance.  Respondents are not merely passive recipients of information about infringement.  The record is replete with evidence that when they began to distribute their free software, each of them clearly voiced the objective that recipients use the software to download copyrighted works and took active steps to encourage infringement.  After the notorious file-sharing service, Napster, was sued by copyright holders for facilitating copyright infringement, both respondents promoted and marketed themselves as Napster alternatives.  They receive no revenue

from users, but, instead, generate income by selling advertising space, then streaming the advertising to their users. As the number of users increases, advertising opportunities are worth more. There is no evidence that either respondent made an effort to filter copyrighted material from users' downloads or otherwise to impede the sharing of copyrighted files.

While acknowledging that respondents' users had directly infringed MGM's copyrights, the District Court nonetheless granted respondents summary judgment as to liability arising from distribution of their software. The Ninth Circuit affirmed. It read *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S. 417, as holding that the distribution of a commercial product capable of substantial noninfringing uses could not give rise to contributory liability for infringement unless the distributor had actual knowledge of specific instances of infringement and failed to act on that knowledge. Because the appeals court found respondents' software to be capable of substantial noninfringing uses and because respondents had no actual knowledge of infringement owing to the software's decentralized architecture, the court held that they were not liable. It also held that they did not materially contribute to their users' infringement because the users themselves searched for, retrieved, and stored the infringing files, with no involvement by respondents beyond providing the software in the first place. Finally, the court held that respondents could not be held liable under a vicarious infringement theory because they did not monitor or control the software's use, had no agreed-upon right or current ability to supervise its use, and had no independent duty to police infringement.

*Held:* One who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, going beyond mere distribution with knowledge of third-party action, is liable for the resulting acts of infringement by third parties using the device, regardless of the device's lawful uses. Pp. 10–24.

(a) The tension between the competing values of supporting creativity through copyright protection and promoting technological innovation by limiting infringement liability is the subject of this case. Despite offsetting considerations, the argument for imposing indirect liability here is powerful, given the number of infringing downloads that occur daily using respondents' software. When a widely shared product is used to commit infringement, it may be impossible to enforce rights in the protected work effectively against all direct infringers, so that the only practical alternative is to go against the device's distributor for secondary liability on a theory of contributory or vicarious infringement. One infringes contributorily by intentionally

inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise the right to stop or limit it. Although "[t]he Copyright Act does not expressly render anyone liable for [another's] infringement," *Sony,* 464 U. S*.,* at 434, these secondary liability doctrines emerged from common law principles and are well established in the law, *e.g., id.*, at 486. Pp. 10–13.

   (b) *Sony* addressed a claim that secondary liability for infringement can arise from the very distribution of a commercial product. There, copyright holders sued Sony, the manufacturer of videocassette recorders, claiming that it was contributorily liable for the infringement that occurred when VCR owners taped copyrighted programs. The evidence showed that the VCR's principal use was "time-shifting," *i.e.,* taping a program for later viewing at a more convenient time, which the Court found to be a fair, noninfringing use. 464 U. S., at 423–424. Moreover, there was no evidence that Sony had desired to bring about taping in violation of copyright or taken active steps to increase its profits from unlawful taping. *Id.*, at 438. On those facts, the only conceivable basis for liability was on a theory of contributory infringement through distribution of a product. *Id.*, at 439. Because the VCR was "capable of commercially significant non-infringing uses," the Court held that Sony was not liable. *Id.,* at 442. This theory reflected patent law's traditional staple article of commerce doctrine that distribution of a component of a patented device will not violate the patent if it is suitable for use in other ways. 35 U. S. C §271(c). The doctrine absolves the equivocal conduct of selling an item with lawful and unlawful uses and limits liability to instances of more acute fault. In this case, the Ninth Circuit misread *Sony* to mean that when a product is capable of substantial lawful use, the producer cannot be held contributorily liable for third parties' infringing use of it, even when an actual purpose to cause infringing use is shown, unless the distributors had specific knowledge of infringement at a time when they contributed to the infringement and failed to act upon that information. *Sony* did not displace other secondary liability theories. Pp. 13–17.

   (c) Nothing in *Sony* requires courts to ignore evidence of intent to promote infringement if such evidence exists. It was never meant to foreclose rules of fault-based liability derived from the common law. 464 U. S., at 439. Where evidence goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and shows statements or actions directed to promoting infringement, *Sony*'s staple-article rule will not preclude liability. At common law a copyright or patent defendant who "not only expected but invoked [infringing use] by advertisement" was liable for infringement.

*Kalem Co.* v. *Harper Brothers*, 222 U. S. 55, 62–63.  The rule on inducement of infringement as developed in the early cases is no different today.  Evidence of active steps taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use, shows an affirmative intent that the product be used to infringe, and overcomes the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use.  A rule that premises liability on purposeful, culpable expression and conduct does nothing to compromise legitimate commerce or discourage innovation having a lawful promise.  Pp. 17–20.

   (d) On the record presented, respondents' unlawful objective is unmistakable.  The classic instance of inducement is by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations.  MGM argues persuasively that such a message is shown here.  Three features of the evidence of intent are particularly notable.  First, each of the respondents showed itself to be aiming to satisfy a known source of demand for copyright infringement, the market comprising former Napster users.  Respondents' efforts to supply services to former Napster users indicate a principal, if not exclusive, intent to bring about infringement.  Second, neither respondent attempted to develop filtering tools or other mechanisms to diminish the infringing activity using their software.  While the Ninth Circuit treated that failure as irrelevant because respondents lacked an independent duty to monitor their users' activity, this evidence underscores their intentional facilitation of their users' infringement.  Third, respondents make money by selling advertising space, then by directing ads to the screens of computers employing their software.  The more their software is used, the more ads are sent out and the greater the advertising revenue.  Since the extent of the software's use determines the gain to the distributors, the commercial sense of their enterprise turns on high-volume use, which the record shows is infringing.  This evidence alone would not justify an inference of unlawful intent, but its import is clear in the entire record's context.  Pp. 20–23.

   (e) In addition to intent to bring about infringement and distribution of a device suitable for infringing use, the inducement theory requires evidence of actual infringement by recipients of the device, the software in this case.  There is evidence of such infringement on a gigantic scale.  Because substantial evidence supports MGM on all elements, summary judgment for respondents was error.  On remand, reconsideration of MGM's summary judgment motion will be in order.  Pp. 23–24.

380 F. 3d 1154, vacated and remanded.

Syllabus

SOUTER, J., delivered the opinion for a unanimous Court. GINSBURG, J., filed a concurring opinion, in which REHNQUIST, C. J., and KENNEDY, J., joined. BREYER, J., filed a concurring opinion, in which STEVENS and O'CONNOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 04–480

METRO-GOLDWYN-MAYER STUDIOS INC., ET AL., PETITIONERS *v.* GROKSTER, LTD., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 27, 2005]

JUSTICE SOUTER delivered the opinion of the Court.

The question is under what circumstances the distributor of a product capable of both lawful and unlawful use is liable for acts of copyright infringement by third parties using the product. We hold that one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties.

## I

### A

Respondents, Grokster, Ltd., and StreamCast Networks, Inc., defendants in the trial court, distribute free software products that allow computer users to share electronic files through peer-to-peer networks, so called because users' computers communicate directly with each other, not through central servers. The advantage of peer-to-peer networks over information networks of other types shows up in their substantial and growing popularity. Because they need no central computer server to mediate the exchange of information or files among users, the high-

bandwidth communications capacity for a server may be dispensed with, and the need for costly server storage space is eliminated.  Since copies of a file (particularly a popular one) are available on many users' computers, file requests and retrievals may be faster than on other types of networks, and since file exchanges do not travel through a server, communications can take place between any computers that remain connected to the network without risk that a glitch in the server will disable the network in its entirety.  Given these benefits in security, cost, and efficiency, peer-to-peer networks are employed to store and distribute electronic files by universities, government agencies, corporations, and libraries, among others.[1]

Other users of peer-to-peer networks include individual recipients of Grokster's and StreamCast's software, and although the networks that they enjoy through using the software can be used to share any type of digital file, they have prominently employed those networks in sharing copyrighted music and video files without authorization. A group of copyright holders (MGM for short, but including motion picture studios, recording companies, songwriters, and music publishers) sued Grokster and StreamCast for their users' copyright infringements, alleging that they knowingly and intentionally distributed their software to enable users to reproduce and distribute the copyrighted works in violation of the Copyright Act, 17 U. S. C. §101 *et seq*. (2000 ed. and Supp. II).[2]  MGM sought

––––––––––

[1] Peer-to-peer networks have disadvantages as well.  Searches on peer-to-peer networks may not reach and uncover all available files because search requests may not be transmitted to every computer on the network.  There may be redundant copies of popular files.  The creator of the software has no incentive to minimize storage or bandwidth consumption, the costs of which are borne by every user of the network.  Most relevant here, it is more difficult to control the content of files available for retrieval and the behavior of users.

[2] The studios and recording companies and the songwriters and music publishers filed separate suits against the defendants that were con-

damages and an injunction.

Discovery during the litigation revealed the way the software worked, the business aims of each defendant company, and the predilections of the users. Grokster's eponymous software employs what is known as FastTrack technology, a protocol developed by others and licensed to Grokster. StreamCast distributes a very similar product except that its software, called Morpheus, relies on what is known as Gnutella technology.[3] A user who downloads and installs either software possesses the protocol to send requests for files directly to the computers of others using software compatible with FastTrack or Gnutella. On the FastTrack network opened by the Grokster software, the user's request goes to a computer given an indexing capacity by the software and designated a supernode, or to some other computer with comparable power and capacity to collect temporary indexes of the files available on the computers of users connected to it. The supernode (or indexing computer) searches its own index and may communicate the search request to other supernodes. If the file is found, the supernode discloses its location to the computer requesting it, and the requesting user can download the file directly from the computer located. The copied file is placed in a designated sharing folder on the requesting user's computer, where it is available for other users to download in turn, along with any other file in that folder.

In the Gnutella network made available by Morpheus, the process is mostly the same, except that in some versions of the Gnutella protocol there are no supernodes. In these versions, peer computers using the protocol commu-

---

solidated by the District Court.

[3] Subsequent versions of Morpheus, released after the record was made in this case, apparently rely not on Gnutella but on a technology called Neonet. These developments are not before us.

nicate directly with each other. When a user enters a
search request into the Morpheus software, it sends the
request to computers connected with it, which in turn pass
the request along to other connected peers. The search
results are communicated to the requesting computer, and
the user can download desired files directly from peers'
computers. As this description indicates, Grokster and
StreamCast use no servers to intercept the content of the
search requests or to mediate the file transfers conducted
by users of the software, there being no central point
through which the substance of the communications
passes in either direction.[4]

Although Grokster and StreamCast do not therefore
know when particular files are copied, a few searches
using their software would show what is available on the
networks the software reaches. MGM commissioned a
statistician to conduct a systematic search, and his study
showed that nearly 90% of the files available for download
on the FastTrack system were copyrighted works.[5] Grok-
ster and StreamCast dispute this figure, raising methodo-
logical problems and arguing that free copying even of
copyrighted works may be authorized by the rightholders.
They also argue that potential noninfringing uses of their
software are significant in kind, even if infrequent in
practice. Some musical performers, for example, have
gained new audiences by distributing their copyrighted
works for free across peer-to-peer networks, and some

——————

[4] There is some evidence that both Grokster and StreamCast previ-
ously operated supernodes, which compiled indexes of files available on
all of the nodes connected to them. This evidence, pertaining to previ-
ous versions of the defendants' software, is not before us and would not
affect our conclusions in any event.

[5] By comparison, evidence introduced by the plaintiffs in *A & M Re-
cords, Inc.* v. *Napster, Inc.*, 239 F. 3d 1004 (CA9 2001), showed that
87% of files available on the Napster filesharing network were copy-
righted, *id.*, at 1013.

distributors of unprotected content have used peer-to-peer networks to disseminate files, Shakespeare being an example. Indeed, StreamCast has given Morpheus users the opportunity to download the briefs in this very case, though their popularity has not been quantified.

As for quantification, the parties' anecdotal and statistical evidence entered thus far to show the content available on the FastTrack and Gnutella networks does not say much about which files are actually downloaded by users, and no one can say how often the software is used to obtain copies of unprotected material. But MGM's evidence gives reason to think that the vast majority of users' downloads are acts of infringement, and because well over 100 million copies of the software in question are known to have been downloaded, and billions of files are shared across the FastTrack and Gnutella networks each month, the probable scope of copyright infringement is staggering.

Grokster and StreamCast concede the infringement in most downloads, Brief for Respondents 10, n. 6, and it is uncontested that they are aware that users employ their software primarily to download copyrighted files, even if the decentralized FastTrack and Gnutella networks fail to reveal which files are being copied, and when. From time to time, moreover, the companies have learned about their users' infringement directly, as from users who have sent e-mail to each company with questions about playing copyrighted movies they had downloaded, to whom the companies have responded with guidance.[6] App. 559–563, 808–816, 939–954. And MGM notified the companies of 8 million copyrighted files that could be obtained using their software.

Grokster and StreamCast are not, however, merely passive recipients of information about infringing use.

_____

[6] The Grokster founder contends that in answering these e-mails he often did not read them fully. App. 77, 769.

The record is replete with evidence that from the moment Grokster and StreamCast began to distribute their free software, each one clearly voiced the objective that recipients use it to download copyrighted works, and each took active steps to encourage infringement.

After the notorious file-sharing service, Napster, was sued by copyright holders for facilitation of copyright infringement, *A & M Records, Inc.* v. *Napster, Inc.*, 114 F. Supp. 2d 896 (ND Cal. 2000), aff'd in part, rev'd in part, 239 F. 3d 1004 (CA9 2001), StreamCast gave away a software program of a kind known as OpenNap, designed as compatible with the Napster program and open to Napster users for downloading files from other Napster and OpenNap users' computers. Evidence indicates that "[i]t was always [StreamCast's] intent to use [its OpenNap network] to be able to capture email addresses of [its] initial target market so that [it] could promote [its] StreamCast Morpheus interface to them," App. 861; indeed, the OpenNap program was engineered "'to leverage Napster's 50 million user base,'" *id.*, at 746.

StreamCast monitored both the number of users downloading its OpenNap program and the number of music files they downloaded. *Id.*, at 859, 863, 866. It also used the resulting OpenNap network to distribute copies of the Morpheus software and to encourage users to adopt it. *Id.*, at 861, 867, 1039. Internal company documents indicate that StreamCast hoped to attract large numbers of former Napster users if that company was shut down by court order or otherwise, and that StreamCast planned to be the next Napster. *Id.*, at 861. A kit developed by StreamCast to be delivered to advertisers, for example, contained press articles about StreamCast's potential to capture former Napster users, *id.*, at 568–572, and it introduced itself to some potential advertisers as a company "which is similar to what Napster was," *id.*, at 884. It broadcast banner advertisements to users of other

Napster-compatible software, urging them to adopt its OpenNap. *Id.*, at 586. An internal e-mail from a company executive stated: "'We have put this network in place so that when Napster pulls the plug on their free service . . . or if the Court orders them shut down prior to that . . . we will be positioned to capture the flood of their 32 million users that will be actively looking for an alternative.'" *Id.*, at 588–589, 861.

Thus, StreamCast developed promotional materials to market its service as the best Napster alternative. One proposed advertisement read: "Napster Inc. has announced that it will soon begin charging you a fee. That's if the courts don't order it shut down first. What will you do to get around it?" *Id.*, at 897. Another proposed ad touted StreamCast's software as the "#1 alternative to Napster" and asked "[w]hen the lights went off at Napster . . . where did the users go?" *Id.*, at 836 (ellipsis in original).[7] StreamCast even planned to flaunt the illegal uses of its software; when it launched the OpenNap network, the chief technology officer of the company averred that "[t]he goal is to get in trouble with the law and get sued. It's the best way to get in the new[s]." *Id.*, at 916.

The evidence that Grokster sought to capture the market of former Napster users is sparser but revealing, for Grokster launched its own OpenNap system called Swaptor and inserted digital codes into its Web site so that computer users using Web search engines to look for "Napster" or "[f]ree filesharing" would be directed to the Grokster Web site, where they could download the Grokster software. *Id.*, at 992–993. And Grokster's name is an apparent derivative of Napster.

---

[7]The record makes clear that StreamCast developed these promotional materials but not whether it released them to the public. Even if these advertisements were not released to the public and do not show encouragement to infringe, they illuminate StreamCast's purposes.

StreamCast's executives monitored the number of songs by certain commercial artists available on their networks, and an internal communication indicates they aimed to have a larger number of copyrighted songs available on their networks than other file-sharing networks. *Id.*, at 868. The point, of course, would be to attract users of a mind to infringe, just as it would be with their promotional materials developed showing copyrighted songs as examples of the kinds of files available through Morpheus. *Id.*, at 848. Morpheus in fact allowed users to search specifically for "Top 40" songs, *id.*, at 735, which were inevitably copyrighted. Similarly, Grokster sent users a newsletter promoting its ability to provide particular, popular copyrighted materials. Brief for Motion Picture Studio and Recording Company Petitioners 7–8.

In addition to this evidence of express promotion, marketing, and intent to promote further, the business models employed by Grokster and StreamCast confirm that their principal object was use of their software to download copyrighted works. Grokster and StreamCast receive no revenue from users, who obtain the software itself for nothing. Instead, both companies generate income by selling advertising space, and they stream the advertising to Grokster and Morpheus users while they are employing the programs. As the number of users of each program increases, advertising opportunities become worth more. Cf. App. 539, 804. While there is doubtless some demand for free Shakespeare, the evidence shows that substantive volume is a function of free access to copyrighted work. Users seeking Top 40 songs, for example, or the latest release by Modest Mouse, are certain to be far more numerous than those seeking a free Decameron, and Grokster and StreamCast translated that demand into dollars.

Finally, there is no evidence that either company made an effort to filter copyrighted material from users' downloads or otherwise impede the sharing of copyrighted

files. Although Grokster appears to have sent e-mails warning users about infringing content when it received threatening notice from the copyright holders, it never blocked anyone from continuing to use its software to share copyrighted files. *Id.*, at 75–76. StreamCast not only rejected another company's offer of help to monitor infringement, *id.*, at 928–929, but blocked the Internet Protocol addresses of entities it believed were trying to engage in such monitoring on its networks, *id.*, at 917–922.

B

After discovery, the parties on each side of the case cross-moved for summary judgment. The District Court limited its consideration to the asserted liability of Grokster and StreamCast for distributing the current versions of their software, leaving aside whether either was liable "for damages arising from *past* versions of their software, or from other past activities." 259 F. Supp. 2d 1029, 1033 (CD Cal. 2003). The District Court held that those who used the Grokster and Morpheus software to download copyrighted media files directly infringed MGM's copyrights, a conclusion not contested on appeal, but the court nonetheless granted summary judgment in favor of Grokster and StreamCast as to any liability arising from distribution of the then current versions of their software. Distributing that software gave rise to no liability in the court's view, because its use did not provide the distributors with actual knowledge of specific acts of infringement. Case No. CV 01 08541 SVW (PJWx) (CD Cal., June 18, 2003), App. 1213.

The Court of Appeals affirmed. 380 F. 3d 1154 (CA9 2004). In the court's analysis, a defendant was liable as a contributory infringer when it had knowledge of direct infringement and materially contributed to the infringement. But the court read *Sony Corp. of America* v. *Uni-*

*versal City Studios, Inc.*, 464 U. S. 417 (1984), as holding
that distribution of a commercial product capable of sub-
stantial noninfringing uses could not give rise to contribu-
tory liability for infringement unless the distributor had
actual knowledge of specific instances of infringement and
failed to act on that knowledge.  The fact that the software
was capable of substantial noninfringing uses in the Ninth
Circuit's view meant that Grokster and StreamCast were
not liable, because they had no such actual knowledge,
owing to the decentralized architecture of their software.
The court also held that Grokster and StreamCast did not
materially contribute to their users' infringement because
it was the users themselves who searched for, retrieved,
and stored the infringing files, with no involvement by the
defendants beyond providing the software in the first
place.

The Ninth Circuit also considered whether Grokster and
StreamCast could be liable under a theory of vicarious
infringement.  The court held against liability because the
defendants did not monitor or control the use of the soft-
ware, had no agreed-upon right or current ability to su-
pervise its use, and had no independent duty to police
infringement.  We granted certiorari.  543 U. S. ___ (2004).

## II
### A

MGM and many of the *amici* fault the Court of Ap-
peals's holding for upsetting a sound balance between the
respective values of supporting creative pursuits through
copyright protection and promoting innovation in new
communication technologies by limiting the incidence of
liability for copyright infringement.  The more artistic
protection is favored, the more technological innovation
may be discouraged; the administration of copyright law is
an exercise in managing the trade-off.  See *Sony Corp.* v.
*Universal City Studios*, *supra*, at 442; see generally Gins-

burg, Copyright and Control Over New Technologies of Dissemination, 101 Colum. L. Rev. 1613 (2001); Lichtman & Landes, Indirect Liability for Copyright Infringement: An Economic Perspective, 16 Harv. J. L. & Tech. 395 (2003).

The tension between the two values is the subject of this case, with its claim that digital distribution of copyrighted material threatens copyright holders as never before, because every copy is identical to the original, copying is easy, and many people (especially the young) use file-sharing software to download copyrighted works. This very breadth of the software's use may well draw the public directly into the debate over copyright policy, Peters, Brace Memorial Lecture: Copyright Enters the Public Domain, 51 J. Copyright Soc. 701, 705–717 (2004) (address by Register of Copyrights), and the indications are that the ease of copying songs or movies using software like Grokster's and Napster's is fostering disdain for copyright protection, Wu, When Code Isn't Law, 89 Va. L. Rev. 679, 724–726 (2003). As the case has been presented to us, these fears are said to be offset by the different concern that imposing liability, not only on infringers but on distributors of software based on its potential for unlawful use, could limit further development of beneficial technologies. See, *e.g.*, Lemley & Reese, Reducing Digital Copyright Infringement Without Restricting Innovation, 56 Stan. L. Rev. 1345, 1386–1390 (2004); Brief for Innovation Scholars and Economists as *Amici Curiae* 15–20; Brief for Emerging Technology Companies as *Amici Curiae* 19–25; Brief for Intel Corporation as *Amicus Curiae* 20–22.[8]

--------

[8] The mutual exclusivity of these values should not be overstated, however. On the one hand technological innovators, including those writing filesharing computer programs, may wish for effective copyright protections for their work. See, *e.g.*, Wu, When Code Isn't Law, 89 Va. L. Rev. 679, 750 (2003). (StreamCast itself was urged by an associate

The argument for imposing indirect liability in this case is, however, a powerful one, given the number of infringing downloads that occur every day using StreamCast's and Grokster's software. When a widely shared service or product is used to commit infringement, it may be impossible to enforce rights in the protected work effectively against all direct infringers, the only practical alternative being to go against the distributor of the copying device for secondary liability on a theory of contributory or vicarious infringement. See *In re Aimster Copyright Litigation*, 334 F. 3d 643, 645–646 (CA7 2003).

One infringes contributorily by intentionally inducing or encouraging direct infringement, see *Gershwin Pub. Corp.* v. *Columbia Artists Management, Inc.*, 443 F. 2d 1159, 1162 (CA2 1971), and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it, *Shapiro, Bernstein & Co.* v. *H. L. Green Co.*, 316 F. 2d 304, 307 (CA2 1963).[9]   Although

———————

to "get [its] technology written down and [its intellectual property] protected." App. 866.) On the other hand the widespread distribution of creative works through improved technologies may enable the synthesis of new works or generate audiences for emerging artists. See *Eldred* v. *Ashcroft*, 537 U. S. 186, 223–226 (2003) (STEVENS, J., dissenting); Van Houweling, Distributive Values in Copyright, 83 Texas L. Rev. 1535, 1539–1540, 1562–1564 (2005); Brief for Sovereign Artists et al. as *Amici Curiae* 11.

[9] We stated in *Sony Corp. of America*  v. *Universal City Studios, Inc.*, 464 U. S. 417 (1984), that "'the lines between direct infringement, contributory infringement and vicarious liability are not clearly drawn' . . . . [R]easoned analysis of [the *Sony* plaintiffs' contributory infringement claim] necessarily entails consideration of arguments and case law which may also be forwarded under the other labels, and indeed the parties . . . rely upon such arguments and authority in support of their respective positions on the issue of contributory infringement," *id.*, at 435, n. 17 (quoting *Universal City Studios, Inc.* v. *Sony Corp.*, 480 F. Supp. 429, 457–458 (CD Cal. 1979)). In the present case MGM has argued a vicarious liability theory, which allows imposition of liability when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the

"[t]he Copyright Act does not expressly render anyone liable for infringement committed by another," *Sony Corp.* v. *Universal City Studios,* 464 U. S., at 434, these doctrines of secondary liability emerged from common law principles and are well established in the law, *id.*, at 486 (Blackmun, J., dissenting); *Kalem Co.* v. *Harper Brothers*, 222 U. S. 55, 62–63 (1911); *Gershwin Pub. Corp.* v. *Columbia Artists Management, supra*, at 1162; 3 M. Nimmer & D. Nimmer, Copyright, §12.04[A] (2005).

B

Despite the currency of these principles of secondary liability, this Court has dealt with secondary copyright infringement in only one recent case, and because MGM has tailored its principal claim to our opinion there, a look at our earlier holding is in order. In *Sony Corp.* v. *Universal City Studios*, *supra*, this Court addressed a claim that secondary liability for infringement can arise from the very distribution of a commercial product. There, the product, novel at the time, was what we know today as the videocassette recorder or VCR. Copyright holders sued Sony as the manufacturer, claiming it was contributorily liable for infringement that occurred when VCR owners taped copyrighted programs because it supplied the means used to infringe, and it had constructive knowledge that infringement would occur. At the trial on the merits, the evidence showed that the principal use of the VCR was for "'time-shifting,'" or taping a program for later viewing at a more convenient time, which the Court found to be a fair, not an infringing, use. *Id.*, at 423–424. There was no

—————

defendant initially lacks knowledge of the infringement. See, *e.g., Shapiro, Bernstein & Co.* v. *H. L. Green Co.*, 316 F. 2d 304, 308 (CA2 1963); *Dreamland Ball Room, Inc.* v. *Shapiro, Bernstein & Co.*, 36 F. 2d 354, 355 (CA7 1929). Because we resolve the case based on an inducement theory, there is no need to analyze separately MGM's vicarious liability theory.

evidence that Sony had expressed an object of bringing
about taping in violation of copyright or had taken active
steps to increase its profits from unlawful taping. *Id.*, at
438. Although Sony's advertisements urged consumers to
buy the VCR to "'record favorite shows'" or "'build a li-
brary'" of recorded programs, *id.*, at 459 (Blackmun, J.,
dissenting), neither of these uses was necessarily infring-
ing, *id.*, at 424, 454–455.

On those facts, with no evidence of stated or indicated
intent to promote infringing uses, the only conceivable
basis for imposing liability was on a theory of contributory
infringement arising from its sale of VCRs to consumers
with knowledge that some would use them to infringe. *Id.*,
at 439. But because the VCR was "capable of commer-
cially significant noninfringing uses," we held the manu-
facturer could not be faulted solely on the basis of its
distribution. *Id.,* at 442.

This analysis reflected patent law's traditional staple
article of commerce doctrine, now codified, that distribu-
tion of a component of a patented device will not violate
the patent if it is suitable for use in other ways. 35
U. S. C. §271(c); *Aro Mfg. Co.* v. *Convertible Top Replace-
ment Co.*, 377 U. S. 476, 485 (1964) (noting codification of
cases); *id.*, at 486, n. 6 (same). The doctrine was devised
to identify instances in which it may be presumed from
distribution of an article in commerce that the distributor
intended the article to be used to infringe another's pat-
ent, and so may justly be held liable for that infringement.
"One who makes and sells articles which are only adapted
to be used in a patented combination will be presumed to
intend the natural consequences of his acts; he will be
presumed to intend that they shall be used in the combi-
nation of the patent." *New York Scaffolding Co.* v. *Whit-
ney*, 224 F. 452, 459 (CA8 1915); see also *James Heekin
Co.* v. *Baker*, 138 F. 63, 66 (CA8 1905); *Canda* v. *Michigan
Malleable Iron Co.*, 124 F. 486, 489 (CA6 1903); *Thomson-*

*Houston Electric Co.* v. *Ohio Brass Co.*, 80 F. 712, 720–721 (CA6 1897); *Red Jacket Mfg. Co.* v. *Davis*, 82 F. 432, 439 (CA7 1897); *Holly* v. *Vergennes Machine Co.*, 4 F. 74, 82 (CC Vt. 1880); *Renwick* v. *Pond*, 20 F. Cas. 536, 541 (No. 11,702) (CC SDNY 1872).

In sum, where an article is "good for nothing else" but infringement, *Canda* v. *Michigan Malleable Iron Co.*, *supra*, at 489, there is no legitimate public interest in its unlicensed availability, and there is no injustice in presuming or imputing an intent to infringe, see *Henry* v. *A. B. Dick Co.*, 224 U. S. 1, 48 (1912), overruled on other grounds, *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.*, 243 U. S. 502 (1917). Conversely, the doctrine absolves the equivocal conduct of selling an item with substantial lawful as well as unlawful uses, and limits liability to instances of more acute fault than the mere understanding that some of one's products will be misused. It leaves breathing room for innovation and a vigorous commerce. See *Sony Corp.* v. *Universal City Studios, supra*, at 442; *Dawson Chemical Co.* v. *Rohm & Haas Co.*, 448 U. S. 176, 221 (1980); *Henry* v. *A. B. Dick Co., supra*, at 48.

The parties and many of the *amici* in this case think the key to resolving it is the *Sony* rule and, in particular, what it means for a product to be "capable of commercially significant noninfringing uses." *Sony Corp.* v. *Universal City Studios*, *supra*, at 442. MGM advances the argument that granting summary judgment to Grokster and StreamCast as to their current activities gave too much weight to the value of innovative technology, and too little to the copyrights infringed by users of their software, given that 90% of works available on one of the networks was shown to be copyrighted. Assuming the remaining 10% to be its noninfringing use, MGM says this should not qualify as "substantial," and the Court should quantify Sony to the extent of holding that a product used "princi-

pally" for infringement does not qualify. See Brief for
Motion Picture Studio and Recording Company Petitioners
31. As mentioned before, Grokster and StreamCast reply
by citing evidence that their software can be used to re-
produce public domain works, and they point to copyright
holders who actually encourage copying. Even if in-
fringement is the principal practice with their software
today, they argue, the noninfringing uses are significant
and will grow.

We agree with MGM that the Court of Appeals misap-
plied *Sony*, which it read as limiting secondary liability
quite beyond the circumstances to which the case applied.
*Sony* barred secondary liability based on presuming or
imputing intent to cause infringement solely from the
design or distribution of a product capable of substantial
lawful use, which the distributor knows is in fact used for
infringement. The Ninth Circuit has read *Sony*'s limita-
tion to mean that whenever a product is capable of sub-
stantial lawful use, the producer can never be held con-
tributorily liable for third parties' infringing use of it; it
read the rule as being this broad, even when an actual
purpose to cause infringing use is shown by evidence
independent of design and distribution of the product,
unless the distributors had "specific knowledge of in-
fringement at a time at which they contributed to the
infringement, and failed to act upon that information."
380 F. 3d, at 1162 (internal quotation marks and altera-
tions omitted). Because the Circuit found the StreamCast
and Grokster software capable of substantial lawful use, it
concluded on the basis of its reading of *Sony* that neither
company could be held liable, since there was no showing
that their software, being without any central server,
afforded them knowledge of specific unlawful uses.

This view of *Sony*, however, was error, converting the
case from one about liability resting on imputed intent to
one about liability on any theory. Because *Sony* did not

displace other theories of secondary liability, and because we find below that it was error to grant summary judgment to the companies on MGM's inducement claim, we do not revisit *Sony* further, as MGM requests, to add a more quantified description of the point of balance between protection and commerce when liability rests solely on distribution with knowledge that unlawful use will occur. It is enough to note that the Ninth Circuit's judgment rested on an erroneous understanding of *Sony* and to leave further consideration of the *Sony* rule for a day when that may be required.

C

*Sony*'s rule limits imputing culpable intent as a matter of law from the characteristics or uses of a distributed product. But nothing in *Sony* requires courts to ignore evidence of intent if there is such evidence, and the case was never meant to foreclose rules of fault-based liability derived from the common law.[10] *Sony Corp.* v. *Universal City Studios,* 464 U. S., at 439 ("If vicarious liability is to be imposed on Sony in this case, it must rest on the fact that it has sold equipment with constructive knowledge" of the potential for infringement). Thus, where evidence goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and shows statements or actions directed to promoting infringement, *Sony*'s staple-article rule will not preclude liability.

The classic case of direct evidence of unlawful purpose occurs when one induces commission of infringement by another, or "entic[es] or persuad[es] another" to infringe, Black's Law Dictionary 790 (8th ed. 2004), as by advertising. Thus at common law a copyright or patent defendant

———————

[10] Nor does the Patent Act's exemption from liability for those who distribute a staple article of commerce, 35 U. S. C. §271(c), extend to those who induce patent infringement, §271(b).

who "not only expected but invoked [infringing use] by
advertisement" was liable for infringement "on principles
recognized in every part of the law." *Kalem Co.* v. *Harper
Brothers*, 222 U. S., at 62–63 (copyright infringement).
See also *Henry* v. *A. B. Dick Co.*, 224 U. S., at 48–49 (con-
tributory liability for patent infringement may be found
where a good's "most conspicuous use is one which will
coöperate in an infringement when sale to such user is
invoked by advertisement" of the infringing use); *Thom-
son-Houston Electric Co.* v. *Kelsey Electric R. Specialty
Co.*, 75 F. 1005, 1007–1008 (CA2 1896) (relying on adver-
tisements and displays to find defendant's "willingness . . .
to aid other persons in any attempts which they may be
disposed to make towards [patent] infringement"); *Rum-
ford Chemical Works* v. *Hecker*, 20 F. Cas. 1342, 1346 (No.
12,133) (CC N. J. 1876) (demonstrations of infringing
activity along with "avowals of the [infringing] purpose
and use for which it was made" supported liability for
patent infringement).

The rule on inducement of infringement as developed in
the early cases is no different today.[11]  Evidence of "active
steps . . . taken to encourage direct infringement," *Oak
Industries, Inc.* v. *Zenith Electronics Corp.,* 697 F. Supp.
988, 992 (ND Ill. 1988), such as advertising an infringing
use or instructing how to engage in an infringing use,
show an affirmative intent that the product be used to
infringe, and a showing that infringement was encouraged
overcomes the law's reluctance to find liability when a
defendant merely sells a commercial product suitable for
some lawful use, see, *e.g., Water Technologies Corp.* v.
*Calco, Ltd.*, 850 F. 2d 660, 668 (CA Fed. 1988) (liability for
inducement where one "actively and knowingly aid[s] and
abet[s] another's direct infringement" (emphasis omitted));
*Fromberg, Inc.* v. *Thornhill*, 315 F. 2d 407, 412–413 (CA5

--------

[11] Inducement has been codified in patent law.  *Ibid.*

1963) (demonstrations by sales staff of infringing uses supported liability for inducement); *Haworth Inc.* v. *Herman Miller Inc.*, 37 USPQ 2d 1080, 1090 (WD Mich. 1994) (evidence that defendant "demonstrate[d] and recommend[ed] infringing configurations" of its product could support inducement liability); *Sims* v. *Mack Trucks, Inc.*, 459 F. Supp. 1198, 1215 (ED Pa. 1978) (finding inducement where the use "depicted by the defendant in its promotional film and brochures infringes the . . . patent"), overruled on other grounds, 608 F. 2d 87 (CA3 1979). Cf. W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 37 (5th ed. 1984) ("There is a definite tendency to impose greater responsibility upon a defendant whose conduct was intended to do harm, or was morally wrong").

For the same reasons that *Sony* took the staple-article doctrine of patent law as a model for its copyright safe-harbor rule, the inducement rule, too, is a sensible one for copyright. We adopt it here, holding that one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties. We are, of course, mindful of the need to keep from trenching on regular commerce or discouraging the development of technologies with lawful and unlawful potential. Accordingly, just as *Sony* did not find intentional inducement despite the knowledge of the VCR manufacturer that its device could be used to infringe, 464 U. S., at 439, n. 19, mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor to liability. Nor would ordinary acts incident to product distribution, such as offering customers technical support or product updates, support liability in themselves. The inducement rule, instead, premises liability on purposeful, culpable expression and conduct, and thus does nothing to

compromise legitimate commerce or discourage innovation having a lawful promise.

## III

### A

The only apparent question about treating MGM's evidence as sufficient to withstand summary judgment under the theory of inducement goes to the need on MGM's part to adduce evidence that StreamCast and Grokster communicated an inducing message to their software users. The classic instance of inducement is by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations. MGM claims that such a message is shown here. It is undisputed that StreamCast beamed onto the computer screens of users of Napster-compatible programs ads urging the adoption of its OpenNap program, which was designed, as its name implied, to invite the custom of patrons of Napster, then under attack in the courts for facilitating massive infringement. Those who accepted StreamCast's OpenNap program were offered software to perform the same services, which a factfinder could conclude would readily have been understood in the Napster market as the ability to download copyrighted music files. Grokster distributed an electronic newsletter containing links to articles promoting its software's ability to access popular copyrighted music. And anyone whose Napster or free file-sharing searches turned up a link to Grokster would have understood Grokster to be offering the same file-sharing ability as Napster, and to the same people who probably used Napster for infringing downloads; that would also have been the understanding of anyone offered Grokster's suggestively named Swaptor software, its version of OpenNap. And both companies communicated a clear message by responding affirmatively to requests for help in locating and playing copyrighted materials.

In StreamCast's case, of course, the evidence just described was supplemented by other unequivocal indications of unlawful purpose in the internal communications and advertising designs aimed at Napster users ("When the lights went off at Napster . . . where did the users go?" App. 836 (ellipsis in original)). Whether the messages were communicated is not to the point on this record. The function of the message in the theory of inducement is to prove by a defendant's own statements that his unlawful purpose disqualifies him from claiming protection (and incidentally to point to actual violators likely to be found among those who hear or read the message). See *supra*, at 17–19. Proving that a message was sent out, then, is the preeminent but not exclusive way of showing that active steps were taken with the purpose of bringing about infringing acts, and of showing that infringing acts took place by using the device distributed. Here, the summary judgment record is replete with other evidence that Grokster and StreamCast, unlike the manufacturer and distributor in *Sony*, acted with a purpose to cause copyright violations by use of software suitable for illegal use. See *supra*, at 6–9.

Three features of this evidence of intent are particularly notable. First, each company showed itself to be aiming to satisfy a known source of demand for copyright infringement, the market comprising former Napster users. StreamCast's internal documents made constant reference to Napster, it initially distributed its Morpheus software through an OpenNap program compatible with Napster, it advertised its OpenNap program to Napster users, and its Morpheus software functions as Napster did except that it could be used to distribute more kinds of files, including copyrighted movies and software programs. Grokster's name is apparently derived from Napster, it too initially offered an OpenNap program, its software's function is likewise comparable to Napster's, and it attempted to

divert queries for Napster onto its own Web site. Grokster and StreamCast's efforts to supply services to former Napster users, deprived of a mechanism to copy and distribute what were overwhelmingly infringing files, indicate a principal, if not exclusive, intent on the part of each to bring about infringement.

Second, this evidence of unlawful objective is given added significance by MGM's showing that neither company attempted to develop filtering tools or other mechanisms to diminish the infringing activity using their software. While the Ninth Circuit treated the defendants' failure to develop such tools as irrelevant because they lacked an independent duty to monitor their users' activity, we think this evidence underscores Grokster's and StreamCast's intentional facilitation of their users' infringement.[12]

Third, there is a further complement to the direct evidence of unlawful objective. It is useful to recall that StreamCast and Grokster make money by selling advertising space, by directing ads to the screens of computers employing their software. As the record shows, the more the software is used, the more ads are sent out and the greater the advertising revenue becomes. Since the extent of the software's use determines the gain to the distributors, the commercial sense of their enterprise turns on high-volume use, which the record shows is infringing.[13]

--------

[12] Of course, in the absence of other evidence of intent, a court would be unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement, if the device otherwise was capable of substantial noninfringing uses. Such a holding would tread too close to the *Sony* safe harbor.

[13] Grokster and StreamCast contend that any theory of liability based on their conduct is not properly before this Court because the rulings in the trial and appellate courts dealt only with the present versions of their software, not "past acts . . . that allegedly encouraged infringement or assisted . . . known acts of infringement." Brief for Respondents 14; see also *id.*, at 34. This contention misapprehends the basis

This evidence alone would not justify an inference of unlawful intent, but viewed in the context of the entire record its import is clear.

The unlawful objective is unmistakable.

## B

In addition to intent to bring about infringement and distribution of a device suitable for infringing use, the inducement theory of course requires evidence of actual infringement by recipients of the device, the software in this case. As the account of the facts indicates, there is evidence of infringement on a gigantic scale, and there is no serious issue of the adequacy of MGM's showing on this point in order to survive the companies' summary judgment requests. Although an exact calculation of infringing use, as a basis for a claim of damages, is subject to dispute, there is no question that the summary judgment evidence is at least adequate to entitle MGM to go forward with claims for damages and equitable relief.

\* \* \*

In sum, this case is significantly different from *Sony* and reliance on that case to rule in favor of StreamCast and Grokster was error. *Sony* dealt with a claim of liability based solely on distributing a product with alternative lawful and unlawful uses, with knowledge that some users would follow the unlawful course. The case struck a bal-

--------

for their potential liability. It is not only that encouraging a particular consumer to infringe a copyright can give rise to secondary liability for the infringement that results. Inducement liability goes beyond that, and the distribution of a product can itself give rise to liability where evidence shows that the distributor intended and encouraged the product to be used to infringe. In such a case, the culpable act is not merely the encouragement of infringement but also the distribution of the tool intended for infringing use. See *Kalem Co.* v. *Harper Brothers*, 222 U. S. 55, 62–63 (1911); *Cable/Home Communication Corp.* v. *Network Productions, Inc.*, 902 F. 2d 829, 846 (CA11 1990); *A & M Records, Inc.* v. *Abdallah*, 948 F. Supp. 1449, 1456 (CD Cal. 1996).

ance between the interests of protection and innovation by holding that the product's capability of substantial lawful employment should bar the imputation of fault and consequent secondary liability for the unlawful acts of others.

MGM's evidence in this case most obviously addresses a different basis of liability for distributing a product open to alternative uses.  Here, evidence of the distributors' words and deeds going beyond distribution as such shows a purpose to cause and profit from third-party acts of copyright infringement.  If liability for inducing infringement is ultimately found, it will not be on the basis of presuming or imputing fault, but from inferring a patently illegal objective from statements and actions showing what that objective was.

There is substantial evidence in MGM's favor on all elements of inducement, and summary judgment in favor of Grokster and StreamCast was error.  On remand, reconsideration of MGM's motion for summary judgment will be in order.

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 04–480

METRO-GOLDWYN-MAYER STUDIOS INC., ET AL.,
PETITIONERS *v.* GROKSTER, LTD., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 27, 2005]

JUSTICE GINSBURG, with whom THE CHIEF JUSTICE and JUSTICE KENNEDY join, concurring.

I concur in the Court's decision, which vacates in full the judgment of the Court of Appeals for the Ninth Circuit, *ante*, at 24, and write separately to clarify why I conclude that the Court of Appeals misperceived, and hence misapplied, our holding in *Sony Corp. of America* v. *Universal City Studios, Inc.,* 464 U. S. 417 (1984). There is here at least a "genuine issue as to [a] material fact," Fed. Rule Civ. Proc. 56(c), on the liability of Grokster or StreamCast, not only for actively inducing copyright infringement, but also or alternatively, based on the distribution of their software products, for contributory copyright infringement. On neither score was summary judgment for Grokster and StreamCast warranted.

At bottom, however labeled, the question in this case is whether Grokster and StreamCast are liable for the direct infringing acts of others. Liability under our jurisprudence may be predicated on actively encouraging (or inducing) infringement through specific acts (as the Court's opinion develops) or on distributing a product distributees use to infringe copyrights, if the product is not capable of "substantial" or "commercially significant" noninfringing uses. *Sony,* 464 U. S., at 442; see also 3 M. Nimmer & D. Nimmer, Nimmer on Copyright §12.04[A][2] (2005). While

the two categories overlap, they capture different culpable behavior.  Long coexisting, both are now codified in patent law.  Compare 35 U. S. C. §271(b) (active inducement liability), with §271(c) (contributory liability for distribution of a product not "suitable for substantial noninfringing use").

In *Sony*, 464 U. S. 417, the Court considered Sony's liability for selling the Betamax video cassette recorder.  It did so enlightened by a full trial record.  Drawing an analogy to the staple article of commerce doctrine from patent law, the *Sony* Court observed that the "sale of an article . . . adapted to [a patent] infringing use" does not suffice "to make the seller a contributory infringer" if the article "is also adapted to other and lawful uses."  *Id.,* at 441 (quoting *Henry* v. *A. B. Dick Co.,* 224 U. S. 1, 48 (1912), overruled on other grounds, *Motion Picture Patents Co.* v. *Universal Film Mfg. Co.,* 243 U. S. 502, 517 (1917)).

"The staple article of commerce doctrine" applied to copyright, the Court stated, "must strike a balance between a copyright holder's legitimate demand for effective—not merely symbolic—protection of the statutory monopoly, and the rights of others freely to engage in substantially unrelated areas of commerce."  *Sony*, 464 U. S., at 442.  "Accordingly," the Court held, "the sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes.  Indeed, it need merely be capable of substantial noninfringing uses."  *Ibid.*  Thus, to resolve the *Sony* case, the Court explained, it had to determine "whether the Betamax is capable of commercially significant noninfringing uses."  *Ibid.*

To answer that question, the Court considered whether "a significant number of [potential uses of the Betamax were] noninfringing."  *Ibid.*  The Court homed in on one potential use—private, noncommercial time-shifting of

television programs in the home (*i.e.*, recording a broadcast TV program for later personal viewing). Timeshifting was noninfringing, the Court concluded, because in some cases trial testimony showed it was authorized by the copyright holder, *id.,* at 443–447, and in others it qualified as legitimate fair use, *id.,* at 447–455. Most purchasers used the Betamax principally to engage in time-shifting, *id.,* at 421, 423, a use that "plainly satisfie[d]" the Court's standard, *id.,* at 442. Thus, there was no need in *Sony* to "give precise content to the question of how much [actual or potential] use is commercially significant." *Ibid.*[1] Further development was left for later days

——————

[1] JUSTICE BREYER finds in *Sony Corp. of America* v. *Universal City Studios, Inc.,* 464 U. S. 417 (1984), a "clear" rule permitting contributory liability for copyright infringement based on distribution of a product only when the product "will be used *almost exclusively* to infringe copyrights." *Post*, at 9–10. But cf. *Sony*, 464 U. S., at 442 (recognizing "copyright holder's legitimate demand for effective—not merely symbolic—protection"). *Sony*, as I read it, contains no clear, nearexclusivity test. Nor have Courts of Appeals unanimously recognized JUSTICE BREYER's clear rule. Compare *A&M Records, Inc.* v. *Napster, Inc.*, 239 F. 3d 1004, 1021 (CA9 2001) ("[E]vidence of actual knowledge of specific acts of infringement is required to hold a computer system operator liable for contributory copyright infringement."), with *In re Aimster Copyright Litigation*, 334 F. 3d 643, 649–650 (CA7 2003) ("[W]hen a supplier is offering a product or service that has noninfringing as well as infringing uses, some estimate of the respective magnitudes of these uses is necessary for a finding of contributory infringement. . . . But the balancing of costs and benefits is necessary only in a case in which substantial noninfringing uses, present or prospective, are demonstrated."). See also *Matthew Bender & Co., Inc.* v. *West Pub. Co.*, 158 F. 3d 693, 707 (CA2 1998) ("The Supreme Court applied [the *Sony*] test to prevent copyright holders from leveraging the copyrights in their original work to control distribution of . . . products that might be used incidentally for infringement, but that had substantial noninfringing uses. . . . The same rationale applies here [to products] that have substantial, predominant and noninfringing uses as tools for research and citation."). All Members of the Court agree, moreover, that "the Court of Appeals misapplied *Sony*," at least to the extent it read that decision to limit "secondary liability" to a hardly-ever cate-

and cases.

The Ninth Circuit went astray, I will endeavor to explain, when that court granted summary judgment to Grokster and StreamCast on the charge of contributory liability based on distribution of their software products. Relying on its earlier opinion in *A&M Records, Inc.* v. *Napster, Inc.*, 239 F. 3d 1004 (CA9 2001), the Court of Appeals held that "if substantial noninfringing use was shown, the copyright owner would be required to show that the defendant had reasonable knowledge of specific infringing files." 380 F. 3d 1154, 1161 (CA9 2004). "A careful examination of the record," the court concluded, "indicates that there is no genuine issue of material fact as to noninfringing use." *Ibid.* The appeals court pointed to the band Wilco, which made one of its albums available for free downloading, to other recording artists who may have authorized free distribution of their music through the Internet, and to public domain literary works and films available through Grokster's and StreamCast's software. *Ibid.* Although it acknowledged MGM's assertion that "the vast majority of the software use is for copyright infringement," the court concluded that Grokster's and StreamCast's proffered evidence met *Sony*'s requirement that "a product need only be *capable* of substantial noninfringing uses." 380 F. 3d, at 1162.[2]

This case differs markedly from *Sony*. Cf. Peters, Brace Memorial Lecture: Copyright Enters the Public Domain, 51 J. Copyright Soc. 701, 724 (2004) ("The *Grokster* panel's reading of *Sony* is the broadest that any court has given it

_____

gory, "quite beyond the circumstances to which the case applied." *Ante*, at 16.

[2] Grokster and StreamCast, in the Court of Appeals' view, would be entitled to summary judgment unless MGM could show that that the software companies had knowledge of specific acts of infringement and failed to act on that knowledge—a standard the court held MGM could not meet. 380 F. 3d, at 1162–1163.

. . . .”). Here, there has been no finding of any fair use and little beyond anecdotal evidence of noninfringing uses. In finding the Grokster and StreamCast software products capable of substantial noninfringing uses, the District Court and the Court of Appeals appear to have relied largely on declarations submitted by the defendants. These declarations include assertions (some of them hearsay) that a number of copyright owners authorize distribution of their works on the Internet and that some public domain material is available through peer-to-peer networks including those accessed through Grokster’s and StreamCast’s software. 380 F. 3d, at 1161; 259 F. Supp. 2d 1029, 1035–1036 (CD Cal. 2003); App. 125–171.

The District Court declared it “undisputed that there are substantial noninfringing uses for Defendants’ software,” thus obviating the need for further proceedings. 259 F. Supp. 2d, at 1035. This conclusion appears to rest almost entirely on the collection of declarations submitted by Grokster and StreamCast. *Ibid.* Review of these declarations reveals mostly anecdotal evidence, sometimes obtained second-hand, of authorized copyrighted works or public domain works available online and shared through peer-to-peer networks, and general statements about the benefits of peer-to-peer technology. See, *e.g.,* Decl. of Janis Ian ¶13, App. 128 (“P2P technologies offer musicians an alternative channel for promotion and distribution.”); Decl. of Gregory Newby ¶12, *id.,* at 136 (“Numerous authorized and public domain Project Gutenberg eBooks are made available on Morpheus, Kazaa, Gnutella, Grokster, and similar software products.”); Decl. of Aram Sinnreich ¶6, *id.,* at 151 (“file sharing seems to have a net positive impact on music sales”); Decl. of John Busher ¶8, *id.,* at 166 (“I estimate that Acoustica generates sales of between $1,000 and $10,000 per month as a result of the distribution of its trialware software through the Gnutella and FastTrack Networks.”); Decl. of Patricia D. Hoekman ¶¶3–

4, *id.,* at 169–170 (search on Morpheus for "President
Bush speeches" found several video recordings, searches
for "Declaration of Independence" and "Bible" found vari-
ous documents and declarant was able to download a copy
of the Declaration); Decl. of Sean L. Mayers ¶11, *id.,* at 67
("Existing open, decentralized peer-to-peer file-sharing
networks . . . offer content owners distinct business advan-
tages over alternate online distribution technologies.").
Compare Decl. of Brewster Kahle ¶20, *id.,* at 142 ("Those
who download the Prelinger films . . . are entitled to redis-
tribute those files, and the Archive welcomes their redis-
tribution by the Morpheus-Grokster-KaZaa community of
users."), with Deposition of Brewster Kahle, *id.,* at 396–
403 (Sept. 18, 2002) (testifying that he has no knowledge
of any person downloading a Prelinger film using Mor-
pheus, Grokster, or KaZaA).  Compare also Decl. of Rich-
ard Prelinger ¶17, *id.,* at 147 ("[W]e welcome further
redistribution of the Prelinger films . . . by individuals
using peer-to-peer software products like Morpheus, Ka-
ZaA and Grokster."), with Deposition of Richard Prelinger,
*id.,* at 410–411 (Oct. 1, 2002) ("Q. What is your under-
standing of Grokster?  A. I have no understanding of
Grokster. . . . Q. Do you know whether any user of the
Grokster software has made available to share any Prelin-
ger film?  A. No.").  See also Deposition of Aram Sinnreich,
*id.,* at 390 (Sept. 25, 2002) (testimony about the band
Wilco based on "[t]he press and industry news groups and
scuttlebutt.").  These declarations do not support summary
judgment in the face of evidence, proffered by MGM, of
overwhelming use of Grokster's and StreamCast's soft-
ware for infringement.[3]

––––––––

[3] JUSTICE BREYER finds support for summary judgment in this motley
collection of declarations and in a survey conducted by an expert
retained by MGM.  *Post*, at 4–8.  That survey identified 75% of the files
available through Grokster as copyrighted works owned or controlled
by the plaintiffs, and 15% of the files as works likely copyrighted.  App.

Even if the absolute number of noninfringing files copied using the Grokster and StreamCast software is large, it does not follow that the products are therefore put to substantial noninfringing uses and are thus immune from liability. The number of noninfringing copies may be reflective of, and dwarfed by, the huge total volume of files shared. Further, the District Court and the Court of Appeals did not sharply distinguish between uses of Grokster's and StreamCast's software products (which this case is about) and uses of peer-to-peer technology generally (which this case is not about).

In sum, when the record in this case was developed, there was evidence that Grokster's and StreamCast's products were, and had been for some time, overwhelmingly used to infringe, *ante*, at 4–6; App. 434–439, 476–481, and that this infringement was the overwhelming source of revenue from the products, *ante,* at 8–9; 259 F. Supp. 2d, at 1043–1044. Fairly appraised, the evidence was insufficient to demonstrate, beyond genuine debate, a reasonable prospect that substantial or commercially significant noninfringing uses were likely to develop over

---

439. As to the remaining 10% of the files, "there was not enough information to form reasonable conclusions either as to what those files even consisted of, and/or whether they were infringing or non-infringing." App. 479. Even assuming, as JUSTICE BREYER does, that the *Sony* Court would have absolved Sony of contributory liability solely on the basis of the use of the Betamax for authorized time-shifting, *post*, at 3–4, summary judgment is not inevitably appropriate here. *Sony* stressed that the plaintiffs there owned "well below 10%" of copyrighted television programming, 464 U. S., at 443, and found, based on trial testimony from representatives of the four major sports leagues and other individuals authorized to consent to home-recording of their copyrighted broadcasts, that a similar percentage of program copying was authorized, *id.,* at 424. Here, the plaintiffs allegedly control copyrights for 70% or 75% of the material exchanged through the Grokster and StreamCast software, 380 F. 3d, at 1158; App. 439, and the District Court does not appear to have relied on comparable testimony about authorized copying from copyright holders.

time.  On this record, the District Court should not have
ruled dispositively on the contributory infringement
charge by granting summary judgment to Grokster and
StreamCast.[4]

If, on remand, the case is not resolved on summary
judgment in favor of MGM based on Grokster and
StreamCast actively inducing infringement, the Court of
Appeals, I would emphasize, should reconsider, on a fuller
record, its interpretation of *Sony*'s product distribution
holding.

─────────

[4] The District Court's conclusion that "[p]laintiffs do not dispute that
Defendants' software is being used, and could be used, for substantial
noninfringing purposes," 259 F. Supp. 2d 1029, 1036 (CD Cal. 2003);
accord 380 F. 3d, at 1161, is, to say the least, dubious.  In the courts
below and in this Court, MGM has continuously disputed any such
conclusion.  Brief for Motion Picture Studio and Recording Company
Petitioners 30–38; Brief for MGM Plaintiffs-Appellants in No. 03–
55894, etc. (CA9), p. 41; App. 356–357, 361–365.

# SUPREME COURT OF THE UNITED STATES

No. 04–480

METRO-GOLDWYN-MAYER STUDIOS INC., ET AL.,
PETITIONERS *v.* GROKSTER, LTD., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 27, 2005]

JUSTICE BREYER, with whom JUSTICE STEVENS and JUSTICE O'CONNOR join, concurring.

I agree with the Court that the distributor of a dual-use technology may be liable for the infringing activities of third parties where he or she actively seeks to advance the infringement. *Ante*, at 1. I further agree that, in light of our holding today, we need not now "revisit" *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S. 417 (1984). *Ante*, at 17. Other Members of the Court, however, take up the *Sony* question: whether Grokster's product is "capable of 'substantial' or 'commercially significant' noninfringing uses." *Ante*, at 1 (GINSBURG, J., concurring) (quoting *Sony*, *supra*, at 442). And they answer that question by stating that the Court of Appeals was wrong when it granted summary judgment on the issue in Grokster's favor. *Ante*, at 4. I write to explain why I disagree with them on this matter.

I

The Court's opinion in *Sony* and the record evidence (as described and analyzed in the many briefs before us) together convince me that the Court of Appeals' conclusion has adequate legal support.

A

I begin with *Sony*'s standard. In *Sony*, the Court con-

sidered the potential copyright liability of a company that
did not itself illegally copy protected material, but rather
sold a machine—a Video Cassette Recorder (VCR)—that
could be used to do so.  A buyer could use that machine for
*non*infringing purposes, such as recording for later view-
ing (sometimes called "'time-shifting,'" *Sony*, 464 U. S*.,* at
421) uncopyrighted television programs or copyrighted
programs with a copyright holder's permission.  The buyer
could use the machine for infringing purposes as well,
such as building libraries of taped copyrighted programs.
Or, the buyer might use the machine to record copyrighted
programs under circumstances in which the legal status of
the act of recording was uncertain (*i.e.*, where the copying
may, or may not, have constituted a "fair use," *id.*, at 425–
426).  Sony knew many customers would use its VCRs to
engage in unauthorized copying and "'library-building.'"
*Id.*, at 458–459 (Blackmun, J., dissenting).  But that fact,
said the Court, was insufficient to make Sony itself an
infringer.  And the Court ultimately held that Sony was
not liable for its customers' acts of infringement.

   In reaching this conclusion, the Court recognized the
need for the law, in fixing *secondary* copyright liability, to
"strike a balance between a copyright holder's legitimate
demand for effective—not merely symbolic—protection of
the statutory monopoly, and the rights of others freely to
engage in substantially unrelated areas of commerce." *Id.*,
at 442.  It pointed to patent law's "staple article of com-
merce" doctrine, *ibid.*, under which a distributor of a
product is not liable for patent infringement by its cus-
tomers unless that product is "unsuited for any commer-
cial noninfringing use." *Dawson Chemical Co.* v. *Rohm &
Haas Co.*, 448 U. S. 176, 198 (1980).  The Court wrote that
the sale of copying equipment, "like the sale of other arti-
cles of commerce, does not constitute contributory in-
fringement if the product is widely used for legitimate,
unobjectionable purposes.  *Indeed*, *it need merely be capa-*

*ble of substantial noninfringing uses.*" *Sony*, 464 U. S., at 442 (emphasis added). The Court ultimately characterized the legal "question" in the particular case as "whether [Sony's VCR] is *capable of commercially significant noninfringing uses*" (while declining to give "precise content" to these terms). *Ibid.* (emphasis added).

It then applied this standard. The Court had before it a survey (commissioned by the District Court and then prepared by the respondents) showing that roughly 9% of all VCR recordings were of the type—namely, religious, educational, and sports programming—owned by producers and distributors testifying on Sony's behalf who did not object to time-shifting. See Brief for Respondent Universal Studios et al. O. T. 1983, No. 81–1687, pp. 52–53; see also *Sony, supra*, at 424 (7.3% of all Sony VCR use is to record sports programs; representatives of the sports leagues do not object). A much higher percentage of VCR *users* had at one point taped an authorized program, in addition to taping unauthorized programs. And the plaintiffs—not a large class of content providers as in this case—owned only a small percentage of the total available *un*authorized programming. See *ante*, at 6–7, and n. 3 (GINSBURG, J., concurring). But of all the taping actually done by Sony's customers, only around 9% was of the sort the Court referred to as authorized.

The Court found that the magnitude of authorized programming was "significant," and it also noted the "significant potential for future authorized copying." 464 U. S., at 444. The Court supported this conclusion by referencing the trial testimony of professional sports league officials and a religious broadcasting representative. *Id.*, at 444, and n. 24. It also discussed (1) a Los Angeles educational station affiliated with the Public Broadcasting Service that made many of its programs available for home taping, and (2) Mr. Rogers' Neighborhood, a widely watched children's program. *Id.*, at 445.

On the basis of this testimony and other similar evidence, the Court determined that producers of this kind had authorized duplication of their copyrighted programs "in significant enough numbers to create a *substantial* market for a noninfringing use of the" VCR.  *Id.*, at 447, n. 28 (emphasis added).

The Court, in using the key word "substantial," indicated that these circumstances alone constituted a sufficient basis for rejecting the imposition of secondary liability.  See *id.*, at 456 ("Sony demonstrated a significant likelihood that *substantial* numbers of copyright holders" would not object to time-shifting (emphasis added)).  Nonetheless, the Court buttressed its conclusion by finding separately that, in any event, *un*authorized time-shifting often constituted not infringement, but "fair use."  *Id.*, at 447–456.

B

When measured against *Sony'*s underlying evidence and analysis, the evidence now before us shows that Grokster passes *Sony*'s test—that is, whether the company's product is capable of substantial or commercially significant noninfringing uses.  *Id.*, at 442.  For one thing, petitioners' (hereinafter MGM) own expert declared that 75% of current files available on Grokster are infringing and 15% are "likely infringing."  See App. 436–439, ¶¶6–17 (Decl. of Dr. Ingram Olkin); cf. *ante*, at 4 (opinion of the Court).  That leaves some number of files near 10% that apparently are noninfringing, a figure very similar to the 9% or so of authorized time-shifting uses of the VCR that the Court faced in *Sony*.

As in *Sony,* witnesses here explained the nature of the noninfringing files on Grokster's network without detailed quantification.  Those files include:

—Authorized copies of music by artists such as Wilco,

Janis Ian, Pearl Jam, Dave Matthews, John Mayer, and others. See App. at 152–153, ¶¶9–13 (Decl. of Aram Sinnreich) (Wilco's "lesson has already been adopted by artists still signed to their major labels"); *id.*, at 170, ¶¶5–7 (Decl. of Patricia D. Hoekman) (locating "numerous audio recordings" that were authorized for swapping); *id.*, at 74, ¶10 (Decl. of Daniel B. Rung) (describing Grokster's partnership with a company that hosts music from thousands of independent artists)

—Free electronic books and other works from various online publishers, including Project Gutenberg. See *id.*, at 136, ¶12 (Decl. of Gregory B. Newby) ("Numerous authorized and public domain Project Gutenberg eBooks are made available" on Grokster. Project Gutenberg "welcomes this widespread sharing . . . using these software products[,] since they assist us in meeting our objectives"); *id.,* at 159–160, ¶32 (Decl. of Sinnreich)

—Public domain and authorized software, such as WinZip 8.1. *Id.*, at 170, ¶8 (Decl. of Hoekman); *id.*, at 165, ¶¶4–7 (Decl. of John Busher)

—Licensed music videos and television and movie segments distributed via digital video packaging with the permission of the copyright holder. *Id.*, at 70, ¶24 (Decl. of Sean L. Mayers)

The nature of these and other lawfully swapped files is such that it is reasonable to infer quantities of current lawful use roughly approximate to those at issue in *Sony*. At least, MGM has offered no evidence sufficient to survive summary judgment that could plausibly demonstrate a significant quantitative difference. See *ante*, at 4 (opinion of the Court); see also Brief for Motion Picture Studio and Recording Company Petitioners i (referring to "at

least 90% of the total use of the services"); but see *ante*, at
6–7, n. 3 (GINSBURG, J., concurring).  To be sure, in quan-
titative terms these uses account for only a small percent-
age of the total number of uses of Grokster's product.  But
the same was true in *Sony*, which characterized the rela-
tively limited authorized copying market as "substantial."
(The Court made clear as well in *Sony* that the amount of
material then presently available for lawful copying—if
not actually copied—was significant, see 464 U. S., at 444,
and the same is certainly true in this case.)

Importantly, *Sony* also used the word "capable," asking
whether the product is "*capable of*" substantial noninfring-
ing uses.  Its language and analysis suggest that a figure
like 10%, if fixed for all time, might well prove insufficient,
but that such a figure serves as an adequate foundation
where there is a reasonable prospect of expanded legiti-
mate uses over time.  See *ibid.* (noting a "significant po-
tential for future authorized copying").  And its language
also indicates the appropriateness of looking to potential
future uses of the product to determine its "capability."

Here the record reveals a significant future market for
noninfringing uses of Grokster-type peer-to-peer software.
Such software permits the exchange of *any* sort of digital
file—whether that file does, or does not, contain copy-
righted material.  As more and more uncopyrighted infor-
mation is stored in swappable form, it seems a likely
inference that lawful peer-to-peer sharing will become
increasingly prevalent.  See, *e.g.*, App. 142, ¶20 (Decl. of
Brewster Kahle) ("The [Internet Archive] welcomes [the]
redistribution [of authorized films] by the Morpheus-
Grokster-KaZaa community of users"); *id.*, at 166, ¶8
(Decl. of Busher) (sales figures of $1,000 to $10,000 per
month through peer-to-peer networks "will increase in the
future as Acoustica's trialware is more widely distributed
through these networks"); *id.*, at 156–164, ¶¶21–40 (Decl.
of Sinnreich).

And that is just what is happening. Such legitimate noninfringing uses are coming to include the swapping of: *research information* (the initial purpose of many peer-to-peer networks); *public domain films* (*e.g.*, those owned by the Prelinger Archive); *historical recordings and digital educational materials* (*e.g.*, those stored on the Internet Archive); *digital photos* (OurPictures, for example, is starting a P2P photo-swapping service); *"shareware" and "freeware"* (*e.g.*, Linux and certain Windows software); *secure licensed music and movie files* (Intent MediaWorks, for example, protects licensed content sent across P2P networks); *news broadcasts past and present* (the BBC Creative Archive lets users "rip, mix and share the BBC"); *user-created audio and video files* (including "podcasts" that may be distributed through P2P software); *and all manner of free "open content" works collected by Creative Commons* (one can search for Creative Commons material on StreamCast). See Brief for Distributed Computing Industry Association as *Amicus Curiae* 15–26; Merges, A New Dynamism in the Public Domain, 71 U. Chi. L. Rev. 183 (2004). I can find nothing in the record that suggests that this course of events will *not* continue to flow naturally as a consequence of the character of the software taken together with the foreseeable development of the Internet and of information technology. Cf. *ante*, at 1–2 (opinion of the Court) (discussing the significant benefits of peer-to-peer technology).

There may be other now-unforeseen noninfringing uses that develop for peer-to-peer software, just as the home-video rental industry (unmentioned in *Sony*) developed for the VCR. But the foreseeable development of such uses, when taken together with an estimated 10% noninfringing material, is sufficient to meet *Sony*'s standard. And while *Sony* considered the record following a trial, there are no facts asserted by MGM in its summary judgment filings that lead me to believe the outcome after a trial here could

be any different.    The lower courts reached the same
conclusion.

Of course, Grokster itself may not want to develop these
other noninfringing uses.    But *Sony*'s standard seeks to
protect not the Groksters of this world (which in any event
may well be liable under today's holding), but the devel-
opment of technology more generally.    And Grokster's
desires in this respect are beside the point.

## II

The real question here, I believe, is not whether the
record evidence satisfies *Sony.*  As I have interpreted the
standard set forth in that case, it does.  And of the Courts
of Appeals that have considered the matter, only one has
proposed interpreting *Sony* more strictly than I would
do—in a case where the product might have failed under
*any* standard.    *In re Aimster Copyright Litigation*, 334
F. 3d 643, 653 (CA7 2003) (defendant "failed to show that
its service is *ever* used for any purpose other than to in-
fringe" copyrights (emphasis added)); see *Matthew Bender
& Co.*, *Inc.* v. *West Pub. Co.*, 158 F. 3d 693, 706–707 (CA2
1998) (court did not *require* that noninfringing uses be
"predominant," it merely found that they *were* predomi-
nant, and therefore provided no analysis of *Sony*'s bounda-
ries); but see *ante*, at 3 n. 1 (GINSBURG, J., concurring); see
also *A&M Records* v. *Napster, Inc.*, 239 F. 3d 1004, 1020
(CA9 2001) (discussing *Sony*); *Cable/Home Communica-
tion Corp.* v. *Network Productions, Inc.*, 902 F. 2d 829,
842–847 (CA11 1990) (same); *Vault Corp.* v. *Quaid Soft-
ware, Ltd.*, 847 F. 2d 255, 262 (CA5 1988) (same); cf. *Dy-
nacore Holdings Corp.* v. *U. S. Philips Corp.*, 363 F. 3d
1263, 1275 (CA Fed. 2004) (same); see also *Doe* v. *GTE
Corp.*, 347 F. 3d 655, 661 (CA7 2003) ("A person may be
liable as a contributory infringer if the product or service
it sells has no (or only slight) legal use").

Instead, the real question is whether we should modify

the *Sony* standard, as MGM requests, or interpret *Sony* more strictly, as I believe JUSTICE GINSBURG's approach would do in practice. Compare *ante*, at 4–8 (concurring) (insufficient evidence in this case of both present lawful uses and of a reasonable prospect that substantial noninfringing uses would develop over time), with *Sony*, 464 U. S., at 442–447 (basing conclusion as to the likely existence of a substantial market for authorized copying upon general declarations, some survey data, and common sense).

As I have said, *Sony* itself sought to "strike a balance between a copyright holder's legitimate demand for effective—not merely symbolic—protection of the statutory monopoly, and the rights of others freely to engage in substantially unrelated areas of commerce." *Id.*, at 442. Thus, to determine whether modification, or a strict interpretation, of *Sony* is needed, I would ask whether MGM has shown that *Sony* incorrectly balanced copyright and new-technology interests. In particular: (1) Has *Sony* (as I interpret it) worked to protect new technology? (2) If so, would modification or strict interpretation significantly weaken that protection? (3) If so, would new or necessary copyright-related benefits outweigh any such weakening?

## A

The first question is the easiest to answer. *Sony*'s rule, as I interpret it, has provided entrepreneurs with needed assurance that they will be shielded from copyright liability as they bring valuable new technologies to market.

*Sony's rule is clear.* That clarity allows those who develop new products that are capable of substantial noninfringing uses to know, *ex ante*, that distribution of their product will not yield massive monetary liability. At the same time, it helps deter them from distributing products that have no other real function than—or that are specifically intended for—copyright infringement, deterrence

that the Court's holding today reinforces (by adding a weapon to the copyright holder's legal arsenal).

*Sony's rule is strongly technology protecting.* The rule deliberately makes it difficult for courts to find secondary liability where new technology is at issue. It establishes that the law will not impose copyright liability upon the distributors of dual-use technologies (who do not themselves engage in unauthorized copying) unless the product in question will be used *almost exclusively* to infringe copyrights (or unless they actively induce infringements as we today describe). *Sony* thereby recognizes that the copyright laws are not intended to discourage or to control the emergence of new technologies, including (perhaps especially) those that help disseminate information and ideas more broadly or more efficiently. Thus *Sony*'s rule shelters VCRs, typewriters, tape recorders, photocopiers, computers, cassette players, compact disc burners, digital video recorders, MP3 players, Internet search engines, and peer-to-peer software. But *Sony*'s rule does not shelter descramblers, even if one could *theoretically* use a descrambler in a noninfringing way. 464 U. S., at 441–442; Compare *Cable/Home Communication Corp.*, *supra*, at 837–850 (developer liable for advertising television signal descrambler), with *Vault Corp.*, *supra*, at 262 (primary use infringing but a substantial noninfringing use).

*Sony's rule is forward looking.* It does not confine its scope to a static snapshot of a product's current uses (thereby threatening technologies that have undeveloped future markets). Rather, as the VCR example makes clear, a product's market can evolve dramatically over time. And *Sony*—by referring to a *capacity* for substantial noninfringing uses—recognizes that fact. *Sony*'s word "capable" refers to a plausible*,* not simply a theoretical, likelihood that such uses will come to pass, and that fact anchors *Sony* in practical reality. Cf. *Aimster*, *supra*, at 651.

*Sony's rule is mindful of the limitations facing judges where matters of technology are concerned.* Judges have no specialized technical ability to answer questions about present or future technological feasibility or commercial viability where technology professionals, engineers, and venture capitalists themselves may radically disagree and where answers may differ depending upon whether one focuses upon the time of product development or the time of distribution. Consider, for example, the question whether devices can be added to Grokster's software that will filter out infringing files. MGM tells us this is easy enough to do, as do several *amici* that produce and sell the filtering technology. See, *e.g.,* Brief for Motion Picture Studio Petitioners 11; Brief for Audible Magic Corp. et al. as *Amicus Curiae* 3–10. Grokster says it is not at all easy to do, and not an efficient solution in any event, and several apparently disinterested computer science professors agree. See Brief for Respondents 31; Brief for Computer Science Professors as *Amicus Curiae* 6–10, 14–18. Which account should a judge credit? *Sony* says that the judge will not necessarily have to decide.

Given the nature of the *Sony* rule, it is not surprising that in the last 20 years, there have been relatively few contributory infringement suits—based on a product distribution theory—brought against technology providers (a small handful of federal appellate court cases and perhaps fewer than two dozen District Court cases in the last 20 years). I have found nothing in the briefs or the record that shows that *Sony* has failed to achieve its innovation-protecting objective.

### B

The second, more difficult, question is whether a modified *Sony* rule (or a strict interpretation) would significantly weaken the law's ability to protect new technology. JUSTICE GINSBURG's approach would require defendants

to produce considerably more concrete evidence—more than was presented here—to earn *Sony*'s shelter. That heavier evidentiary demand, and especially the more dramatic (case-by-case balancing) modifications that MGM and the Government seek, would, I believe, undercut the protection that *Sony* now offers.

To require defendants to provide, for example, detailed evidence—say business plans, profitability estimates, projected technological modifications, and so forth—would doubtless make life easier for copyrightholder plaintiffs. But it would simultaneously increase the legal uncertainty that surrounds the creation or development of a new technology capable of being put to infringing uses. Inventors and entrepreneurs (in the garage, the dorm room, the corporate lab, or the boardroom) would have to fear (and in many cases endure) costly and extensive trials when they create, produce, or distribute the sort of information technology that can be used for copyright infringement. They would often be left guessing as to how a court, upon later review of the product and its uses, would decide when necessarily rough estimates amounted to sufficient evidence. They would have no way to predict how courts would weigh the respective values of infringing and noninfringing uses; determine the efficiency and advisability of technological changes; or assess a product's potential future markets. The price of a wrong guess—even if it involves a good-faith effort to assess technical and commercial viability—could be large statutory damages (not less than $750 and up to $30,000 *per infringed work*). 17 U. S. C. §504(c)(1). The additional risk and uncertainty would mean a consequent additional chill of technological development.

C

The third question—whether a positive copyright impact would outweigh any technology-related loss—I find the

most difficult of the three. I do not doubt that a more intrusive *Sony* test would generally provide greater revenue security for copyright holders. But it is harder to conclude that the gains on the copyright swings would exceed the losses on the technology roundabouts.

For one thing, the law disfavors equating the two different kinds of gain and loss; rather, it leans in favor of protecting technology. As *Sony* itself makes clear, the producer of a technology which *permits* unlawful copying does not himself *engage* in unlawful copying—a fact that makes the attachment of copyright liability to the creation, production, or distribution of the technology an exceptional thing. See 464 U. S., at 431 (courts "must be circumspect" in construing the copyright laws to preclude distribution of new technologies). Moreover, *Sony* has been the law for some time. And that fact imposes a serious burden upon copyright holders like MGM to show a need for change in the current rules of the game, including a more strict interpretation of the test. See, *e.g.*, Brief for Motion Picture Studio Petitioners 31 (*Sony* should not protect products when the "primary or principal" use is infringing).

In any event, the evidence now available does not, in my view, make out a sufficiently strong case for change. To say this is not to doubt the basic need to protect copyrighted material from infringement. The Constitution itself stresses the vital role that copyright plays in advancing the "useful Arts." Art. I, §8, cl. 8. No one disputes that "reward to the author or artist serves to induce release to the public of the products of his creative genius." *United States* v. *Paramount Pictures, Inc.*, 334 U. S. 131, 158 (1948). And deliberate unlawful copying is no less an unlawful taking of property than garden-variety theft. See, *e.g.*, 18 U. S. C. §2319 (criminal copyright infringement); §1961(1)(B) (copyright infringement can be a predicate act under the Racketeer Influenced and Corrupt

Organizations Act); §1956(c)(7)(D) (money laundering includes the receipt of proceeds from copyright infringement). But these highly general principles cannot by themselves tell us how to balance the interests at issue in *Sony* or whether *Sony'*s standard needs modification. And at certain key points, information is lacking.

Will an unmodified *Sony* lead to a significant diminution in the amount or quality of creative work produced? Since copyright's basic objective is creation and its revenue objectives but a means to that end, this is the underlying copyright question. See *Twentieth Century Music Corp.* v. *Aiken*, 422 U. S. 151, 156 (1975) ("Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts"). And its answer is far from clear.

Unauthorized copying likely diminishes industry revenue, though it is not clear by how much. Compare S. Liebowitz, Will MP3 Downloads Annihilate the Record Industry? The Evidence So Far, p. 2 (June 2003), http://www.utdallas.edu/~liebowit/intprop/records.pdf (all Internet materials as visited June 24, 2005, and available in Clerk of Court's case file) (file sharing has caused a decline in music sales), and Press Release, Informa Media Group Report (citing Music on the Internet (5th ed. 2004)) (estimating total lost sales to the music industry in the range of $2 billion annually), at http://www.informatm.com, with F. Oberholzer & K. Strumpf, The Effect of File Sharing on Record Sales: An Empirical Analysis, p. 24 (Mar. 2004), www.unc.edu/~cigar/papers/FileSharing_March2004.pdf (academic study concluding that "file sharing has no statistically significant effect on purchases of the average album"), and McGuire, Study: File-Sharing No Threat to Music Sales (Mar. 29, 2004), http://www.washingtonpost.com/ac2/wp-dyn/A34300-2004

Mar29?language=printer (discussing mixed evidence).

The extent to which related production has actually and resultingly declined remains uncertain, though there is good reason to believe that the decline, if any, is not substantial. See, *e.g.*, M. Madden, Pew Internet & American Life Project, Artists, Musicians, and the Internet, p. 21, http://www.pewinternet.org/pdfs/PIP_Artists.Musicians_ Report.pdf (nearly 70% of musicians believe that file sharing is a minor threat or no threat at all to creative industries); Benkler, Sharing Nicely: On Shareable Goods and the Emergence of Sharing as a Modality of Economic Production, 114 Yale L. J. 273, 351–352 (2004) ("Much of the actual flow of revenue to artists—from performances and other sources—is stable even assuming a complete displacement of the CD market by peer-to-peer distribution . . . . [I]t would be silly to think that music, a cultural form without which no human society has existed, will cease to be in our world [because of illegal file swapping]").

More importantly, copyright holders at least potentially have other tools available to reduce piracy and to abate whatever threat it poses to creative production. As today's opinion makes clear, a copyright holder may proceed against a technology provider where a provable specific intent to infringe (of the kind the Court describes) is present. *Ante*, at 24 (opinion of the Court). Services like Grokster may well be liable under an inducement theory.

In addition, a copyright holder has always had the legal authority to bring a traditional infringement suit against one who wrongfully copies. Indeed, since September 2003, the Recording Industry Association of America (RIAA) has filed "thousands of suits against people for sharing copyrighted material." Walker, New Movement Hits Universities: Get Legal Music, Washington Post, Mar. 17, 2005, p. E1. These suits have provided copyright holders with damages; have served as a teaching tool, making clear that much file sharing, if done without permission, is

unlawful; and apparently have had a real and significant deterrent effect. See, *e.g.*, L. Rainie, M. Madden, D. Hess, & G. Mudd, Pew Internet Project and comScore Media Metrix Data Memo: The state of music downloading and file-sharing online, pp. 2, 4, 6, 10 (Apr. 2004), www.pewinternet.org/pdfs/PIP_Filesharing_April_04.pdf (number of people downloading files fell from a peak of roughly 35 million to roughly 23 million in the year following the first suits; 38% of current downloaders report downloading fewer files because of the suits); M. Madden & L. Rainie, Pew Internet Project Data Memo: Music and video downloading moves beyond P2P, p. 7 (March 2005), www.pewinternet.org/pdfs/PIP_Filesharing_March05.pdf (number of downloaders has "inched up" but "continues to rest well below the peak level"); Groennings, Note, Costs and Benefits of the Recording Industry's Litigation Against Individuals, 20 Berkeley Technology L. J. 571 (2005); but see Evangelista, Downloading Music and Movie Files is as Popular as Ever, San Francisco Chronicle, Mar. 28, 2005, p. E1 (referring to the continuing "tide of rampant copyright infringement," while noting that the RIAA says it believes the "campaign of lawsuits and public education has at least contained the problem").

Further, copyright holders may develop new technological devices that will help curb unlawful infringement. Some new technology, called "digital 'watermarking'" and "digital fingerprint[ing]," can encode within the file information about the author and the copyright scope and date, which "fingerprints" can help to expose infringers. RIAA Reveals Method to Madness, Wired News, Aug. 28, 2003, http://www.wired.com/news/digiwood/0,1412,60222,00.html; Besek, Anti-Circumvention Laws and Copyright: A Report from the Kernochan Center for Law, Media and the Arts, 27 Colum. J. L. & Arts 385, 391, 451 (2004). Other technology can, through encryption, potentially restrict users' ability to make a digital copy. See J. Borland,

Tripping the Rippers, C/net News.com (Sept. 28, 2001), http://news.com.com/Tripping+the+rippers/2009=1023_3= 273619.html; but see Brief for Bridgemar Services Ltd. as *Amicus Curiae* 5–8 (arguing that peer-to-peer service providers can more easily block unlawful swapping).

At the same time, advances in technology have discouraged unlawful copying by making *lawful* copying (*e.g.*, downloading music with the copyright holder's permission) cheaper and easier to achieve. Several services now sell music for less than $1 per song. (Walmart.com, for example, charges $0.88 each). Consequently, many consumers initially attracted to the convenience and flexibility of services like Grokster are now migrating to lawful paid services (services with copying permission) where they can enjoy at little cost even greater convenience and flexibility without engaging in unlawful swapping. See Wu, When Code Isn't Law, 89 Va. L. Rev. 679, 731–735 (2003) (noting the prevalence of technological problems on unpaid swapping sites); K. Dean, P2P Tilts Toward Legitimacy, wired.com, Wired News (Nov. 24, 2004), http:// www.wired.com/news/digiwood/0,1412,65836,00.html; M. Madden & L. Rainie, March 2005 Data Memo, *supra*, at 6– 7 (percentage of current downloaders who have used paid services rose from 24% to 43% in a year; number using free services fell from 58% to 41%).

Thus, lawful music downloading services—those that charge the customer for downloading music and pay royalties to the copyright holder—have continued to grow and to produce substantial revenue. See Brief for Internet Law Faculty as *Amici Curiae* 5–20; Bruno, Digital Entertainment: Piracy Fight Shows Encouraging Signs (Mar. 5, 2005), available at LEXIS, News Library, Billboard File (in 2004, consumers worldwide purchased more than 10 times the number of digital tracks purchased in 2003; global digital music market of $330 million in 2004 ex-

pected to double in 2005); Press Release, Informa Media Report, *supra* (global digital revenues will likely exceed $3 billion in 2010); Ashton, [International Federation of the Phonographic Industry] Predicts Downloads Will Hit the Mainstream, Music Week, Jan. 29, 2005, p. 6 (legal music sites and portable MP3 players "are helping transform the digital music market" into "an everyday consumer experience"). And more advanced types of *non*-music-oriented P2P networks have also started to develop, drawing in part on the lessons of Grokster.

Finally, as *Sony* recognized, the legislative option remains available. Courts are less well suited than Congress to the task of "accommodat[ing] fully the varied permutations of competing interests that are inevitably implicated by such new technology." *Sony*, 464 U. S., at 431; see, *e.g.*, Audio Home Recording Act of 1992, 106 Stat. 4237 (adding 17 U. S. C., ch. 10); Protecting Innovation and Art While Preventing Piracy: Hearing Before the Senate Comm. on the Judiciary, 108th Cong., 2d Sess. (July 22, 2004).

I do not know whether these developments and similar alternatives will prove sufficient, but I am reasonably certain that, given their existence, a strong demonstrated need for modifying *Sony* (or for interpreting *Sony*'s standard more strictly) has not yet been shown. That fact, along with the added risks that modification (or strict interpretation) would impose upon technological innovation, leads me to the conclusion that we should maintain *Sony*, reading its standard as I have read it. As so read, it requires affirmance of the Ninth Circuit's determination of the relevant aspects of the *Sony* question.

\* \* \*

For these reasons, I disagree with JUSTICE GINSBURG, but I agree with the Court and join its opinion.